*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0260P (6th Cir.)
File Name: 01a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

EILEEN A. LOGAN,
     *Plaintiff-Appellant,*

     *v.*

DENNY'S, INC.,

     *Defendant-Appellee.*

No. 99-4395

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-01342—Donald C. Nugent, District Judge.

Argued: January 26, 2001

Decided and Filed: August 7, 2001

Before: JONES, BATCHELDER, and CLAY, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Dennis P. Zapka, MAGUIRE, SCHNEIDER,
ZAPKA & LEUCHTAG, Cleveland, Ohio, for Appellant.
Brian J. Kelly, FRANTZ & WARD, Cleveland, Ohio, for
Appellee. **ON BRIEF:** Dennis P. Zapka, MAGUIRE,
SCHNEIDER, ZAPKA & LEUCHTAG, Cleveland, Ohio, for

1

Appellant.  Brian J. Kelly, Keith A. Ashmus, FRANTZ & WARD, Cleveland, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which JONES, J., joined. BATCHELDER, J. (pp. 36-51), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

CLAY, Circuit Judge.  Plaintiff, Eileen Logan, f/k/a Eileen Clark, appeals from the district court's order granting summary judgment to Defendant, Denny's Inc., on Plaintiff's race discrimination claim brought under Title VII, 42 U.S.C. § 2000e, *et seq.*  Because we believe that  the district court erred in finding that Plaintiff failed to establish a *prima facie* case of race discrimination, and erred in concluding that no genuine issue of material fact remained as to whether Defendant's proffered reason for its disciplinary action was a pretext for discrimination, we **REVERSE** the district court's order granting Defendant's motion for summary judgment and **REMAND** the case for trial.

**BACKGROUND**
**Procedural History**

On June 9, 1998, Plaintiff, Eileen Logan, an African-American female who had been employed by Defendant as a server for more than ten years, filed a seven-count complaint in the district court alleging, among other things, that Defendant violated her civil rights under Title VII of the Civil Rights Act of 1964, by engaging in discriminatory treatment which led to Plaintiff's constructive discharge.  On July 29, 1998, Defendant filed an answer in response to counts one, two, six, and part of count seven of Plaintiff's complaint; and filed a motion to dismiss as to counts three, four, five and part of count seven of the complaint.  The district court thereafter granted Defendant's motion to dismiss these counts which included "Plaintiff's claims of discrimination in violation of

Even if the majority were correct that Logan carried her burden in resisting Denny's motion for summary judgment, that would not warrant the majority's harsh criticism of the district court judge and defendant's counsel.  At most, the district court's judgment might constitute legal error, and Denny's counsel did nothing more than aggressively represent Denny's, which is precisely what professional ethics mandate that Denny's counsel do in our adversarial system.

For all of these reasons, I dissent.

district court's grant of summary judgment to Denny's. However, I would also hold that Logan wholly failed to present evidence from which a jury could conclude that Denny's articulated non-discriminatory reason for its actions was pretextual. The majority opinion implies that Denny's did not even succeed in presenting such reasons because it did not produce the specific customer complaints or evidence that Logan was counseled about them. But Denny's, of course, was required only to produce some evidence to support its articulated non-discriminatory reason. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2077, 2106 (2000). Denny's clearly did so. And the majority's conclusion is facilitated by its earlier mistaken holding that the evidence Denny's did produce would be disregarded. Logan's conclusory opinions that non-minority servers received better treatment than she are not sufficient to prove pretext, and the record simply does not contain factual support for the majority's conclusion that "a reasonable person could conclude that Defendant took calculated efforts to portray Plaintiff as being a poor server, and humiliated Plaintiff into resigning because she was a black server who was actually very good at her job and posed a threat to her white counterparts."[11]

In sum, Logan presented some evidence that the people at Denny's, including some in management, treated her poorly or insensitively. *See Miles v. General Motors Corp.*, No. 85-3856, 1988 WL 27498, at *3 (6th Cir. Mar. 31, 1988) ("The court appeared to rest on a general feeling that Miles had been treated shabbily, rather than on any evidence that would justify the conclusion that management's stated reasons were non-existent or pretextual."). But she was required to present evidence that she was constructively discharged *because of her race*. She did not carry that burden.

---

[11]This latter observation is, of course, a determination of the ultimate fact at issue here.

OHIO REV. CODE § 4112 (barred by period of limitation), tortious interference with an employment contract, negligent infliction of emotional distress, and a superfluous claim for willful and wanton conduct." (J.A. at 17 n.3). The district court's decision in this regard is not at issue on appeal.

Defendant filed a motion for summary judgment on April 19, 1999, with respect to the remaining counts. Defendant maintained that Plaintiff did not establish a *prima facie* case of discrimination under Title VII inasmuch as Plaintiff failed to demonstrate the elements of a constructive discharge, and therefore failed to establish that she suffered the requisite adverse employment action for a *prima facie* case. Plaintiff filed a memorandum in opposition to Defendant's motion for summary judgment; Defendant filed a reply; and Defendant thereafter filed a supplement to its motion.

On October 12, 1999, the district court issued its memorandum opinion and order granting Defendant's motion for summary judgment on the basis that Plaintiff failed to establish a *prima facie* case of race discrimination under Title VII. Specifically, the court found that Plaintiff failed to establish a constructive discharge for purposes of demonstrating an adverse employment action. The district court recognized that "[a] claim that the adverse employment action was accomplished via constructive discharge is cognizable under Title VII;" however, the court opined that Plaintiff failed to come forward with sufficient evidence to establish that she suffered a constructive discharge because she failed to show that the "working conditions were so difficult or unpleasant that a reasonable person in plaintiff's shoes would feel compelled to resign," or that "Defendant intended to cause the employee to resign or that [her] resignation was a reasonably foreseeable consequence of the Defendant's action." (J.A. at 25, 28.) The court added in a footnote that "[e]ven if Plaintiff could muster a *prima facie* case, she could not – based on the evidence in the record – show that Defendant's reason for changing her job classification (Plaintiff's work performance) was a pretext for

intentional racial discrimination." (J.A. at 28 n.9.) Regarding Plaintiff's remaining state law claim for intentional infliction of emotional distress, the district court found that no genuine issue of material fact remained for trial that Defendant's actions did not rise to the level of extreme and outrageous behavior for purposes of satisfying the requirements of this claim.

The district court entered its corresponding judgment granting Defendant's motion for summary judgment and dismissing Plaintiff's case, and it is from this judgment that Plaintiff now appeals challenging only the dismissal of her Title VII claim.

## Facts

Plaintiff began working for Defendant in August of 1985 at its restaurant located in North Randall, Ohio. In 1995, Plaintiff transferred to Defendant's restaurant located in Highland Heights, Ohio because Defendant closed the North Randall facility. The record indicates that throughout Plaintiff's tenure at the North Randall location, all but one of her performance evaluations bears an overall rating of "AT STANDARDS – Performance is overall equal to or better than the standard required," or "ABOVE STANDARDS – Performance is noticeably better than required." (J.A. at 236-56.) The evaluation forms themselves are standardized forms which list various duties attendant to the respective job position, and require the reviewer to rate the employee's performance as to these duties as "Below Standards," "At Standards," or Above Standards." At the end of the evaluation, the reviewer rates the employee's *overall* performance using the same rating scale. As indicated, only one of Plaintiff's eleven evaluations included in the joint appendix bears an overall rating of "BELOW STANDARDS," although at times she was rated below standards regarding various aspects of her job.

In addition to the standardized ratings, the evaluations also provide a space for the reviewer to include handwritten comments. For example, on what appears to be Plaintiff's

Logan transferred into the Highland Heights restaurant where the other servers and their schedules were already established is not a relevant aspect of Logan's employment status. I disagree. In my view, this is probably the most relevant comparison, particularly with regard to Logan's claim that she should have been given better hours and better locations in the restaurant. Logan's own deposition testimony indicates that the servers were vocal about the fact that they did not want their schedules changed because of a new server. In any event, Logan named only one Caucasian server who she claimed, was given more hours and better locations in the restaurant than she was. However, Logan admitted that Joy Redmond, an African-American server who had been at the Highland Heights location for some 18 years, was also given better hours and more lucrative locations than Logan. The majority opinion discounts this admission on the basis that Redmond was not a full-time server, but the record reflects that after first identifying Redmond as a full-time server, Logan later said that she did not know whether Redmond was full-time or part-time. There is no evidence in the record that Redmond was part-time. Logan claims that no server receiving a Mystery Shopper report similar to hers was ever subjected to having the report posted. She identifies no other server, however, who ever received such a report. Logan identifies no other server who received a report similar to hers who was not told that her continued employment was conditioned on her taking a position as a service assistant, nor does she claim that she attempted to obtain this information through discovery but was denied the opportunity to do so. Finally, Logan claims that other African-American transferees from Randall Park did not last long at Highland Heights, but she provides neither the identities of such persons nor any information about their employment at or departure from Denny's. In short, I believe that Logan failed to present evidence from which a jury could conclude that she was treated less favorably than non-minority servers at the Highland Heights store.

Because I think that Logan failed to present sufficient evidence to make out a prima facie case, I would affirm the

The majority opinion's characterization of the "new tie" incident as racially motivated is similarly troubling. Logan's deposition clearly demonstrates that she has no idea what Denny's policy with regard to ties was or what the circumstances were with regard to this particular tie. Logan came to work without her tie. She was not provided a new one. A white employee came to work and was given a new tie. Logan admits that she does not know and did not inquire whether the white employee had earlier requested or been promised a new tie, but she does say that the white employee told her "I finally got a new tie." Nonetheless, Logan complains that if there was only one tie, Logan should have gotten it. The evidence in the record does not support a reasonable inference that Logan was denied a tie because of her race.

Finally, the majority opinion holds that Logan adduced "copious" evidence with regard to the second prong of the constructive discharge analysis: whether Denny's intended by its actions to force Logan to quit her job. The offensive comments referring to customers from Randall Park Mall, and Denny's treating other servers more favorably than Logan, when taken together with the change in position, the majority says, are more than sufficient to create a genuine issue of fact as to Denny's intent. But the comments, as I have explained, are not racial in nature, and Logan presented little evidence that Denny's in fact treated other servers better than it treated her.

The final element in the prima facie case is that Denny's treated similarly situated individuals more favorably than it treated Logan. Here again, the record does not support the majority opinion's conclusion that Logan presented sufficient evidence to create a genuine issue of fact with regard to this element. The majority opinion correctly says that this court's precedent requires that we focus on whether the plaintiff is similarly situated in all of the relevant aspects to those employees to whom she compares her situation. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The majority then holds that the fact that

six-month evaluation, dated February 24, 1986, the reviewer, Assistant Manager Timothy J. McGuire, rated Plaintiff as "AT STANDARDS" overall, and provided the following handwritten comments:

In Eileen's first 6 months she has been a reliable and efficient, & concerned employee. Her pleasant attitude and her professional manner do not go unnoticed by management nor guests. Eileen has shown flexability [sic] with her hours on the weekend. She has worked both 1st and 2nd shift[s] and on many occasions she has helped magmt. [management] when we have been short staffed. Recently Eileen had her hours changed at her other job. She thought that she might have to leave Denny's. Management worked around her new schedule to assure that Eileen could continue to work for #1851. Her willingness to be flexible showed management that that [sic] she is a caring employee and to lose an employee with this type of attitude would have been a disservice. As shown above Eileen is not weak in any areas. She is competent in service, team work and the other aspects of the job code, server.

Eileen, I would like to take this time to thank you for your efforts and I suggest that you continue to do the things that you have done in the past to continue to grow with both the unit and Denny's.

(J.A. at 239-40.)

Plaintiff's next evaluation, dated August 20, 1986, six months after the first evaluation, indicates that a different assistant manager rated Plaintiff's overall performance as "AT STANDARDS," and he provided the following handwritten comment:

Eileen, overall your performance is "at standards". All your work with training new hires, with also your x-tra efforts in working over/ and assuring good guest service is appreciated. You are diffently [sic] a big help to our units [sic] operations. A few areas to consider for your

next review.   (A) seggustive [sic] sell, sell up etc.
(B) you may want to go an extra step to help out co-
workers when in need (C) cleaning as you go a little
more throughly [sic] (windows, seats, ledges etc.[)].
Eileen, continue to improve, thanks for all your good
efforts.

(J.A. at 241-42.)

The next evaluation provided in the joint appendix is dated
February of 1988; it is from the same assistant manager and
rates Plaintiff as "AT STANDARDS" overall, but does not
bear any handwritten comments.  (J.A. at 243-44.)   The
following evaluation dated May 26, 1989 from Assistant
Manager Michael A. Lewis, also rates Plaintiff as "AT
STANDARDS" overall, and provides a handwritten comment
indicating areas in which Plaintiff needed to improve as well
as the comment: "You have a [sic] good customer relations;
keep up the good service." (J.A. at 246.)  Plaintiff's next
evaluation dated October 1, 1989, from Assistant Manager
Gina Hinde, rates Plaintiff as "ABOVE STANDARDS"
overall, and provides suggested areas of improvement in the
comments section along with the notation, "Overall you're
doing great – Keep it up!" (J.A. at 248.)  Similarly, Plaintiff's
evaluation dated October of 1991, from a different assistant
manager, rates Plaintiff as "ABOVE STANDARDS."

Plaintiff's next two evaluations dated August 26, 1992, and
January 26, 1993, each rate Plaintiff's overall performance as
"AT STANDARDS."  Plaintiff's evaluation in August of
1993 from yet a different assistant manager rates Plaintiff as
"AT STANDARDS," and is embellished with comments such
as "Good Job!!" and "We need you more !!" in the margins of
the evaluation, along with the following comment:

Eileen thank you for helping and being a member of our
weekend team, it's encouraging to know that we can
depend on you consistently on weekends.  One big area
to focus on is sidework duties completed in a more
timely manner and we wish you were more available but
we do understand your circumstances.  Once again [thank

authorities raising other kinds of discrimination claims in
arriving at its conclusions, including *Rogers v. EEOC*, 454
F.2d 234, 238 (5th Cir. 1971) (holding that "mere utterance of
an ethnic or racial epithet which engenders offensive feeling
in an employee" does not rise to the level of a Title VII
violation); and 1 B. Lindermann & P. Grossman, *Employment
Discrimination Law* 349 (3d ed. 1996) (citing cases
instructing, among other things, that "a lack of racial
sensitivity does not, alone, amount to actionable
harassment").  *Faragher*, 524 U.S. at 787.  The Court noted
that "[a]lthough racial and sexual harassment will often take
different forms, and standards may not be entirely
interchangeable, we think there is good sense in seeking
generally to harmonize the standards of what amounts to
actionable harassment."  *Id.* at 787 n.1.  And this circuit has
applied the *Faragher* standard in race cases since shortly after
that case was decided.  *See, e.g., Jackson v. Quanex Corp.*,
191 F.3d 647, 662 (6th Cir. 1999) (citing *Faragher* for the
proposition that "'simple teasing,' offhand comments, and
isolated incidents" ordinarily do not amount to discrimination
under Title VII).

None of the comments the majority characterizes as
carrying the inference of invidious discrimination is overtly
racial in character.  The comment "we don't serve grits here,"
which even Logan admits was made in response to her
question about the availability of various breakfast items,
carries a racial overtone only if grits were food enjoyed only,
or even primarily, by African- Americans.[10]  The other two
comments of which Logan complains, "You're probably used
that 'first of the month rush,'" and "These must have been
some of your people from Randall" are, the majority says,
invidious because the clientele at Randall was low income
and "many may have been" of minority race.  This is simply
not sufficient to permit a "reasonable inference" that the
comments were racial in nature.

_____

[10]Such a contention would come as quite a shock, I would think, to
the people of all races who have grown up in the South, not to mention
the people in the rest of the country who have learned the virtue of grits.

typical discriminatory constructive discharge case, the employer does not overtly seek a discontinuation in the employment relationship but the employee claims to be subjected to intolerable working conditions due to discriminatory behavior." I see no reason to look to the law of the Fifth Circuit, as the majority does, to determine what constitutes a constructive discharge.

The majority opinion concludes—in part by taking judicial notice of the "fact" that the busboy position would necessarily be a demotion and by holding inadmissible all of the affidavit testimony of Denny's witnesses—that Logan has demonstrated that Denny's "conditioning Plaintiff's continued employment on her becoming a busboy created an intolerable work condition such that a reasonable person standing in Plaintiff's shoes would have felt compelled to resign." The claim of constructive discharge is bolstered, the opinion concludes, because the claimed constructive discharge occurred after Logan was subjected to "disparaging comments and alleged incidents of unfair treatment." But unless the intolerable work condition was shown to have been created because of Logan's race, the constructive discharge is not one for which Logan has any remedy under Title VII.

It is therefore important to examine the comments and incidents which Logan claims, and the majority finds, were racial in nature. I would hold that the district court did not err in determining that the record simply does not support such a conclusion, but even if it did, these comments do not rise to the level required to create a hostile work environment. In *Faragher v. Boca Raton*, 524 U.S. 775 (1998), the Supreme Court made it clear that a hostile-work-environment claim must be supported by evidence of extreme conduct, and that the "standards of judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* at 788. Although *Faragher* was a sexual-harassment case, the Court explicitly relied on

you] for all the dedicated and effective team work!! Have a nice day!!

(J.A. at 256.) This evaluation also indicates that Plaintiff was receiving a pay increase from $2.68 per hour to $2.71 per hour. Finally, Plaintiff's evaluation from 1994 (apparently in September of 1994), indicates that she received an "AT STANDARDS" rating.

It was not until what appears to be Plaintiff's last evaluation at Defendant's North Randall facility, dated January 27, 1995, that she received a "BELOW STANDARDS" rating. For the first time on any of her evaluations, as provided in the joint appendix, Plaintiff wrote a comment in the "employee comments" section of the evaluation. Specifically, Plaintiff wrote as follows:

This evaluation is very incorrect. I have put N/A's next to all the things I am incorrectly marked on. Please review correctly!!! I am very insulted in this review. This is the worst one I've gotten at Denny's since my hire date in 1985. I *will* follow up on this Mr. Cross!!

(J.A. at 143, 260.) The "Mr. Cross" to which Plaintiff makes reference in her comment is identified on the evaluation as the "Manager." Apparently, unlike in Plaintiff's previous evaluations, it was Manager Cross, and not the assistant manager who later signed the evaluation on March 25, 1995, who actually conducted the evaluation because Cross' signature bears the same date as that of the evaluation, January 27, 1995. Interestingly, however, both Plaintiff and the assistant manager, who at this point was Linda Taylor, did not sign the evaluation until March 25, 1995, despite the fact that the evaluation bears the January date as does Cross' signature.

In February of 1996, Plaintiff and the other employees of the North Randall facility were notified that Defendant was closing the facility permanently. Plaintiff and the other employees were given the option of transferring to another one of Defendant's restaurants in the district – the restaurant

in Garfield Heights or the restaurant in Highland Heights[1] – if they desired.  In response to the news, Plaintiff discussed her options with her general manager at the time, Linda Taylor, as well as with the general manager of Highland Heights at the time, John Halasz.  Plaintiff claims that Halasz, who at one time had been the manager of the North Randall facility, told her that he would be honored to have Plaintiff transfer to the Highland Heights facility.  When Plaintiff asked Taylor whether she should transfer to Garfield Heights or to Highland Heights, Plaintiff claims that Taylor advised her to transfer to the Highland Heights facility because "it's a faster environment."  Taylor reiterated to Plaintiff that she should transfer to the Highland Heights facility because it was a faster environment and she felt that Plaintiff would do well there.  Plaintiff stated that most of the employees from the North Randall facility who decided to remain employed with Defendant transferred to the Garfield Heights facility because they did not have automobiles, and Garfield Heights was on the bus line, but Highland Heights was not.

Plaintiff began working at the Highland Heights facility on March 14, 1996, and acknowledged that she was "very happy" and "very excited" to begin working there.  Defendant claims that Plaintiff was allowed to transfer to Highland Heights even though the facility was full-staffed.  Within two weeks of beginning work as a server at the Highland Heights facility, Plaintiff received an "above standards" evaluation and a five cents per hour pay increase.

Shortly after beginning work at the Highland Heights facility however, Plaintiff contends that she began experiencing disparaging comments from her co-workers such as "We don't serve 'grits' here;" "You're probably used to that 'first of the month rush,'" implying that many of the customers from the facility where Plaintiff had been employed in North Randall were on public assistance; and

---

[1] In her deposition, Plaintiff refers to the Highland Heights facility as "Wilson Mills" apparently because the restaurant is located on Wilson Mills Road in Highland Heights, Ohio.

person standing in Plaintiff's shoes would have felt compelled to resign."  The majority opinion leaves nothing for the finder of fact to do on remand.

Turning to the substance of Logan's complaint, I agree with the majority opinion that Logan presented sufficient evidence as to the first and second prongs of the prima facie case.  I disagree with the majority opinion's reasoning and conclusions with regard to the third and fourth elements of Logan's prima facie case:  that she suffered an adverse employment action and that she was treated less favorably than a similarly situated individual outside her protected class.  *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996).  To begin with, this circuit has well-established precedent governing the determination of whether a Title VII plaintiff has satisfied the third prong when the plaintiff claims constructive discharge as the adverse employment action.  In *Wilson v. Firestone Tire & Rubber Company*, 932 F.2d 510 (6th Cir. 1991), we held that "[a] demotion within a company does not amount to a constructive discharge unless the proffered employment options would have been 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Id.* at 515 (quoting *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987) and *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).  That standard has been followed consistently in this circuit.  *See, e.g., Kocsis*, 97 F.3d at 887.  In *Moore v. Kuka Welding Systems*, 171 F.3d 1073, 1080 (6th Cir. 1999), we explained:

> To constitute a discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit.  To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.

And in *Scott v. Goodyear Tire & Rubber Company*, 160 F.3d 1121, 1127 (6th Cir. 1998), we made it clear that "[i]n the

presented—and very probably not admissible[8]—in evidence in determining whether the evidence before that court presents a genuine issue of material fact. The majority opinion has thus effected a transmogrification of the standard of review, at least for Title VII defendants which may have been sued for racially discriminatory practices at other times and under different circumstances.

The majority opinion makes numerous findings of fact in reaching its conclusion that the district court erred in granting summary judgment to Denny's. It finds, for example, that the job change offered to Logan was a demotion; that Logan would have suffered a reduction in salary in the new and lesser position; that the job change was humiliating; and that Denny's designation of Logan's assigned station on April 28 as "station eight" was likely intended to refer to the military term for mental instability and thus was intended to humiliate Logan.[9] It even infers that Denny's had, by its actions, "created an intolerable work condition such that a reasonable

---

[8] It is one thing to attempt to offer such evidence at trial, where the defendant would at least have the opportunity to object, not only because it is patently hearsay, but on grounds, for example, that it violates Rule 404(b) of the Federal Rules of Evidence. *See Becker v. ARCO Chem. Co.*, 207 F.3d 176, 192 (3d Cir. 2000) ("Accordingly, because Becker has failed to articulate how the Seaver evidence fits into a chain of logical inferences pointing towards ARCO's intent without involving the inference that because ARCO committed the first act it was more likely to have committed the second, . . . we cannot agree with the district court's conclusion that the evidence was admissible under Rule 404(b) to establish ARCO's intent to discriminate against Becker."). And even if this evidence were found to be admissible under Rule 404(b) as relevant intent, *see Hogan v. American Tel. & Tel.*, 812 F.2d 409 (8th Cir. 1987), the defendant would be entitled to a determination under Rule 403 that its probative value substantially outweighs its prejudicial effect. Here, the majority advocates the consideration of such evidence, without notice to the defendant, and even criticizes the district court for failing to consider the evidence *sua sponte.*

[9] Nowhere in the record was I able to find any indication that anyone other than the panel majority even recognized this possibility, let alone drew the inference.

"These must have been some of your people from Randall," in reference to some customers who did not want to pay for their breakfast. (J.A. at 196.) The latter comment was made by Plaintiff's manager, Greg Mallon. In addition, Plaintiff contends that the white servers were provided with more hours of employment than she was provided, and that the white servers continually told Plaintiff that their hours were not going to be cut because she was allowed to transfer to Highland Heights. Moreover, to the best of Plaintiff's knowledge, no white servers transferred to the Highland Heights facility from the North Randall facility. There was only one other black server besides Plaintiff at Highland Heights, and she was part-time.

Plaintiff complained to management, Greg Mallon and John Halasz, about always being assigned to the back stations of the restaurant because if no hostess was on duty, the servers with the front stations would get more customers. In response to Plaintiff's complaint, management began assigning work stations in a rotating fashion. However, in time this practice stopped. Plaintiff also recalled an incident in March of 1996 when, after driving twenty-five minutes to work in unseasonable weather, she realized upon arriving for duty that she had left the necktie that was part of her uniform at home. Plaintiff went to Mallon, explained what had happened, and asked if he had a spare tie that she could borrow for her shift. Mallon informed Plaintiff that he did not have a spare tie and that she would have to return home if she was not properly attired. Plaintiff remembered that she had an old tie in the trunk of her car, so she went outside, got the tie, and proceeded with her shift. About an hour later, Plaintiff noticed that a one of the other servers – who happened to be white – appeared from the back office with a brand new tie. The server came up to Plaintiff, and excitedly told Plaintiff that she had just gotten a new tie from Mallon. Plaintiff did not respond; however, she claims that her feelings were hurt, particularly when she realized that she could have missed a day's pay when, despite his assertions, Mallon had an extra tie all along.

Shortly after Plaintiff began experiencing these disparaging comments and incidents, what Defendant refers to as a "Mystery Shopper" arrived at the Highland Heights facility during Plaintiff's shift and sat in Plaintiff's section for service. Defendant claims that the Mystery Shopper Program is an external tool utilized by Defendant to monitor the quality of its business. The Mystery Shopper Program was developed and performed by the NPD Group, Inc. ("NDP"), which involved sending "shoppers" to Defendant's various facilities who would present themselves as guests, but were actually evaluating Defendant's services. The Mystery Shopper would complete a form based on his experience at the facility, provide NPD with the results, and NPD in turn would provide the information to Defendant's headquarters in Spartanburg, South Carolina.

The results of the Mystery Shopper's Report ("the Report") concerning the visit to Highland Heights during Plaintiff's shift indicated, according to Defendant, that Plaintiff's "service fell short of the requires [sic] standards in several areas." (J.A. at 145). The Report was provided to Randall Poplin, Defendant's Area Manager, and was posted in the employee section of the Highland Heights facility and bore handwritten comments made by management.

Poplin avers that because he had heard that management had received complaints about Plaintiff's work, he coincidentally appeared at Highland Heights to observe Plaintiff at about the same time that the Mystery Shopper appeared. In his affidavit, Poplin summarized his observations as follows:

Based on my personal observations, it was my opinion in April of 1996 that Ms. Logan was not meeting the legitimate expectations which I had for her as a Server. In particular, Ms. Logan was not performing her job up to the Company standards in a number of areas, including meeting service standards, delivering food and beverages within prescribed times, assisting others and pre-bussing tables.

Defendant is no stranger to race discrimination suits, and the district court's failure to see through Defendant's tactics and recognize the many genuine issues of material fact is disturbing." Majority Op. at 35. But Denny's record of past discrimination—which is not and cannot be at issue here—has been made a central issue in the majority opinion's criticism of the district court.

There is no evidence whatever that the district court had any actual knowledge of Denny's reputed iniquities beyond those alleged in this lawsuit. Even if it did, what I find disturbing is that in reviewing the district court's decision the majority relies upon outside-the-record hearsay evidence of prior bad acts of the defendant. The evidence that the district court is permitted to review on summary judgment is clearly delineated by Rule 56:

The judgment sought shall be rendered forthwith if the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. CIV. P. 56(c). This court must adhere to the same standard. Affidavits, of course, must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). The majority points to no authority that would permit,[7] let alone *require*, the district court to take notice of unrelated lawsuits and articles in the news media, not

---

[7] The majority's citation to *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) and the cases cited therein does not support the majority's use of newspaper articles to bring Denny's racial-discrimination litigation history to the fore in this case. In each of those cases, the articles or books of which the appellate court took judicial notice were material to the specific factual allegations and legal issues raised in the case in which that notice was taken.

Even more disturbing, however, is the majority opinion's reference to articles from the news media and the purported litigation history of Denny's restaurants to increase the burden upon defendants and to change the standard of review that the district court must use in reviewing the record on summary judgment.[6]    The standard of review for summary judgment is well-settled; the court must view the evidence *in the record* in the light most favorable to the non-moving party to determine whether there is a genuine issue of material fact remaining for trial. *See McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 512 (6th Cir. 2000) ("[T]here must exist in the record a genuine issue of material fact.") (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-50, 106 S. Ct. 2505 (1986)).    The majority opinion, without citation to any authority, adds a significant element:

> We are also troubled by the district court's apparent complacency regarding Defendant's misrepresentations as well as the district court's overall handling of the case. Defendant's past history of discriminatory conduct, both to its minority patrons and employees alike, is well known in the jurisprudence and public forums. Examples of highly publicized cases involving Defendant's discriminatory conduct include . . . .

Majority Op. at 34.

The opinion then cites several cases in which Denny's purportedly entered into consent decrees to settle claims of racial discrimination; the opinion also cites and discusses news articles with regard to discrimination claims made against Denny's. The opinion concludes this discussion thus: "Although we recognize that Defendant's past record of discrimination is not at issue here, the fact remains that

---

[6] I do not question that Denny's has a history of racial-discrimination litigation.    But any evidence of that litigation was neither before the district court in the record on summary judgment, nor relevant to these proceedings.    I use the word "purported" to underscore the impropriety of the majority's venturing outside the record in this case.

(J.A. at 145.)    Poplin further avers that as a result of the alleged complaints that management had received about Plaintiff's performance, his personal observations of Plaintiff, as well as the Mystery Shopper's Report, he decided that "corrective" measures needed to be taken as to Plaintiff's employment as a server.

Poplin claims that "[b]ecause Ms. Logan was a long-time employee, [he] decided that the most appropriate step to take would be to offer her an opportunity to move temporarily into a different position, perhaps as a Hostess of [sic] Service Assistant." (J.A. at 145.)    Poplin justified his decision as follows:

> By doing so, Ms. Logan would be able to both acclimate herself to the faster-paced Highland Heights restaurant and learn ways to raise her performance to the necessary level.    The reassignment would not have impacted Ms. Logan's income, as she would have received a higher hourly rate to account for the loss of the ability to earn tips.
>
> It was my intention to allow Ms. Logan to return to a Server position if she improved to the point where she could do so without compromising the quality of service to the guests at the Highland Heights restaurant.

(J.A. at 146.)    Poplin claims that he then prepared an Employee Performance Record ("EPR") "in order to provide Ms. Logan with written notice of the options which were being provided to her." Poplin also claims that because he was unable to meet with Plaintiff at the restaurant during her next scheduled shift, he delivered the EPR to one of the managers at Highland Heights, "with instructions to issue the EPR to Ms. Logan when she reported to work. The EPR prepared stated that it was being issued due to service-related performance issues and that Ms. Logan was being given the option of moving into either a Hostess or a Service Assistant position." (J.A. at 146.)

In her affidavit, Mary Jane delaVega, the manager to whom Poplin assigned the task of reviewing the EPR with Plaintiff, provided an account of her meeting with Plaintiff. delaVega's affidavit is considerably shorter than Poplin's affidavit, and provides in relevant part:

> 3.    The EPR prepared by Mr. Poplin stated that it was being issued due to service-related performance issues and that Ms. Logan was being given the option of moving into a Hostess or a Service Assistant position.
>
> 4.    When Ms. Logan arrived at work on April 28, 1996, I met privately with her in the office in the back of the Restaurant in order to present the EPR to her.
>
> 5.    I presented the EPR to Ms. Logan and gave her the opportunity to read it and sign it.  Ms. Logan read the EPR and then left without signing it.

(J.A. at 147.)

Plaintiff provides a much different account of what happened on April 28, 1996.  Specifically, Plaintiff recounted in her deposition that on the day in question, she reported for work and checked the schedule to ascertain which station of the restaurant she had been assigned to work.  Plaintiff noticed that the schedule read that she had been assigned to "station eight;" however, Plaintiff was confused by this assignment because to the best of her knowledge, there was no station eight at the restaurant.  Because of this odd assignment, Plaintiff went to the manager's office – delaVega was on duty at the time; Plaintiff knocked on the door, and she said to delaVega, "Mary Jean, . . . help me out here, . . . where is station eight." (J.A. at 118.)  According to Plaintiff, delaVega just shook her head and told Plaintiff to come into the office because she needed to talk to Plaintiff.  Plaintiff did as delaVega requested and closed the door behind her.

delaVega then proceeded to ask Plaintiff if she had seen the Report from the Mystery Shopper on the board, to which Plaintiff replied that of course she had seen it, "you can't miss

---

With all due respect to my panel colleagues, viewing the evidence in the light most favorable to Logan does not permit us, as a reviewing court, to take judicial notice of facts of the type noticed by the majority.  The majority opinion says that "we can take judicial notice that a busboy or 'service assistant' as Defendant entitles it, is a job classification below that of a waiter or server, particularly at this type of restaurant."  In my view, the exact status of a "service assistant" or "busboy" at this particular Denny's restaurant, or anywhere else, is not the kind of adjudicative fact of which judicial notice can be taken by this court[5] under the requirements of the Federal Rules of Evidence.[5]  Although the Rules of Evidence do provide that under appropriate circumstances judicial notice may be taken at any stage of the proceedings, courts of appeals are not in the business of finding disputed facts at all, and certainly the majority's use of judicial notice ignores the requirement that the parties have the opportunity to be heard with regard to it.  *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 421 (6th Cir. 2000) ("Rule 201(e) requires the district court to give a party an opportunity to be heard if judicial notice is taken.").  Significantly, whether by removing Logan from her position as a server and offering her another position Denny's demoted her is critical to the determination of the claim of constructive discharge.

---

[5]The taking of judicial notice is governed by Rule 201 of the Federal Rules of Evidence, and provides, in pertinent part:

> **(b) Kinds of facts.**  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>
> **(e) Opportunity to be heard.**  A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.  In the absence of prior notification, the request may be made after judicial notice has been taken.

my view, has no support in the established law.[3]  *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535, 103 S. Ct. 1343, 1344 (1983) ("Needless to say, only this Court may overrule one of its precedents. Until that occurs, [our prior precedent] is the law, and the decision below cannot be reconciled with it.").[4]

The majority defends its finding of facts on appeal as merely bringing "to the fore" evidence that Logan adduced, and says that this comports with venerable precedent concerning summary-judgment review. "Bringing evidence to the fore" amounts to more than viewing the evidence in a light most favorable to the nonmovant, and the majority has gone beyond even that by providing an interpretation of that evidence which Logan has neither provided nor suggested. The majority has couched those interpretations in terms of that would appear to the average reader as making findings of fact.

---

[3]To compare the presentation of facts in Denny's brief to the facts in *Cunningham v. Sears, Roebuck and Co.*, 854 F.2d 914 (6th Cir. 1988), the case the majority cites to support its finding of "deliberate misrepresentation" is to compound the error. *Cunningham* was a case in which the plaintiff, during the course of trial, learned that a juror had falsely testified during voir dire. Not until after the jury returned its verdict— which was adverse to the plaintiff— did the plaintiff or his counsel advise the trial court of this fact. The trial court denied plaintiff's motion for a new trial based on the juror's false testimony and the plaintiff appealed. In the plaintiff's appellate brief, counsel made no mention of his client's knowledge during the trial that the juror's testimony was false; did not include in the joint appendix the trial court's findings on the matter; and stated only that "[w]ithin several days after the conclusion of the second trial of this action, it was learned that a juror . . . had failed to completely and correctly answer a question posed by the Court during the voir dire." *Id.* at 916 (emphasis omitted). This court found counsel's rendition a "serious misrepresentation of the facts." *Id.* That is a far cry from the conduct of counsel here.

[4]*See also Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235, 1239 n.1 (6th Cir. 1993) ("More important, we have no authority to overrule the Supreme Court.").

---

it." (J.A. at 119.) At that point, delaVega looked at Plaintiff, shook her head and said, "I just want you to know this is all Randy's [Poplin's] doings." (J.A. at 119.) delaVega then handed Plaintiff a one-page document, which Plaintiff referred to as a "confirmation confirmer" (the EPR as Poplin refers to it)[2] which, according to Plaintiff, stated that a Mystery Shopper had come into the restaurant and was displeased with the service that Plaintiff provided because the shopper waited too long to be served, was not asked if he would like a refill on his beverage, and was not asked to return for another visit. Plaintiff claims that the document added that because of the Report, if Plaintiff wished to continue her employment with Defendant, her job classification was being changed to "service assistant," which is Defendant's terminology for what is commonly known as a busboy.[3]

Plaintiff claims that after reading the document, the following events transpired:

> So I looked at her and I said, "Mary Jean," I said "you know, this is not even correct, this isn't true, these are lies," I said "this didn't happen," I said "no one comes into this store and waits 20 minutes. As hungry as these servers are for tips, you can't even get a person to walk in and wait for 30 seconds, yet alone 20 minutes for coffee." And she couldn't say anything. And I said "well," I said "I don't know what to say." So I turned around to walk out and she said "well, I need you to sign this," and I [sic] said "sign it," I said "I can't sign this,

---

[2]delaVega clarified in her deposition testimony that "conversation confirmers," as that term is used by Defendant, is about the same thing as an EPR, except that the former is used for coaching while the latter is used for discipline. (J.A. at 293-94.)

[3]delaVega confirmed in her deposition testimony that Defendant uses the title "service assistant" for what is commonly known as "a busboy, bus girl." (J.A. at 285.)

this isn't even true." So I walked out and clocked out, which is about quarter after eight, and went home.

(J.A. at 120.)

After further questioning from defense counsel, Plaintiff added that she asked delaVega if there were any other options to her remaining employed with the company other than becoming a busboy, to which delaVega allegedly responded that, "this is Randy's doing, this is the option right here." Plaintiff claims that she professed to delaVega that after being a server for eleven years, she did not want to wear rubber boots and be a busboy, particularly when the job entailed lifting dishes, the change was degrading, and there were no other female busboys. Plaintiff also claims to have asked delaVega if she could go through some training for her server position if Defendant found her performance lacking, or if she could train to become a hostess, to which delaVega reiterated that the only option was what was before Plaintiff – the service assistant position. Plaintiff stated that if delaVega had offered her a hostess position, she would have accepted the offer.

Plaintiff did not return to work at Highland Heights, and terminated her employment with Defendant after the April 28 incident. Having received a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"), Plaintiff filed the present lawsuit.

## DISCUSSION

We review a grant of summary judgment *de novo. DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). As the party moving for summary judgment, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential

presenting in its brief a list of the plaintiff's shortcomings as they are reflected in her performance reviews. And I find surprising the majority opinion's statement that "[r]eviewing Defendant's brief leads one to conclude that Plaintiff's overall performance as a server has been poor since she began her employment with Defendant." The table in that brief that the majority finds deliberately misleading is prefaced by these words:

> Plaintiff's performance was consistently below Company standards *in a number of areas*. In accordance with Company procedures, Plaintiff's supervisors performed periodic performance evaluations to advise her of these problems and recommend appropriate corrective measures. *The following is a sample of the performance problems brought to Plaintiff's attention through these performance reviews.*

(emphasis added.)

Similarly, the majority reprimands Denny's counsel for misrepresenting the record with regard to the information given to Logan about transferring to the Highland Heights location, stating that the testimony pointed to in Denny's brief "in no way supports" Denny's contention that Logan was "warned" about the conditions at Highland Heights. Significantly, the majority opinion does not dispute any of the specific information to which Denny's brief refers; rather, the majority rests its criticism entirely on the fact that Denny's brief says that Logan was "warned" about these conditions, when the majority believes that, in fact, Logan was merely "advised" about them. But whether Logan was warned or advised, the record does reflect that Logan was told that she would find the working conditions at Highland Heights different from those at Randall. This requirement that Denny's present the evidence supporting its motion for summary judgment in the light most favorable to Logan, in

discharge, are inadmissible *in their entireties*, because the Employment Performance Report ("EPR") prepared with regard to Logan and referred to in those affidavits was not produced. This report was central to Denny's articulated non-discriminatory reason for removing Logan from her position as a waitress. The record does not reflect, nor does Logan claim, that she raised any objection to that testimony before the trial court, either on the ground that the EPR had not been produced or on any other ground. Neither did she file a motion before the trial court pursuant to Rule 55(f) asking for additional discovery before the court ruled on the motion for summary judgment. The majority opinion cites as its authority for disregarding these affidavits *Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993). But *Moore* held that although the evidence was not admissible because the supporting documents had not been submitted, no objection to its admissibility had been raised before the trial court, and the issue was therefore not reviewable. *Id. Moore* not only does not support the majority's *sua sponte* action here, it supports a contrary view.[2]

There is no question that in reviewing a grant of summary judgment, we must view the evidence in the light most favorable to the non-moving party. The law does not, however, require the moving party to present its evidence in the light most favorable to the non-moving party. The majority opinion points to no authority for its view that counsel for Denny's has acted "unconscionabl[y]" by

---

[2] The majority's citation to *Taft Broadcasting Company v. United States*, 929 F.2d 240 (6th Cir. 1991), to bolster its position exacerbates the error. *Taft* did not address an appellant's raising an issue for the first time on appeal in the reply brief, which is the last word in appellate briefing, and *Taft* made very clear that our forgiving what is ordinarily a waiver is the exception, not the rule. We invoke that exception to "'prevent manifest injustice and to promote procedural efficiency,'" *Taft*, 929 F.2d at 244 (quoting *United States v. Baker*, 807 F.2d 1315, 1321 (6th Cir. 1986)), and only when doing so "serves an over-arching purpose beyond that of arriving at the correct result in an individual case." *Foster v. Barilow*, 6 F.3d 405, 408 (6th Cir. 1993). The majority's invoking that exception here does not pass muster under either *Taft* or *Foster*.

element of Plaintiff's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Once Defendant meets its burden of production, Plaintiff, as the nonmoving party, must by deposition, answers to interrogatories, and admissions on file show specific facts that reveal a genuine issue for trial. *Id.* We must accept Plaintiff's evidence as true and draw all reasonable inferences in her favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), viewing all facts and inferences drawn therefrom in the light most favorable to Plaintiff. *DePiero*, 180 F.3d at 776. This Court, like the district court, may not make credibility determinations nor weigh the evidence before it when determining whether an issue of fact remains for trial. *See Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 255).

Plaintiff filed suit under section 2000e-2(a) of Title VII, which provides in relevant part:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Id.*

Under the circumstantial evidence approach – the approach used in the matter at hand – the three-part test of *McDonnell Douglas* is employed. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as later clarified by, *Tex. Dep't*

*of Comty Affairs v. Burdine*, 450 U.S. 248 (1981). This paradigm first requires Plaintiff to establish a *prima facie* case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802. To establish a *prima facie* case of discrimination under Title VII, Plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class. *See id.*; *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992).

If Plaintiff is able to establish a *prima facie* case, then under the next step of the tripartite test, a mandatory presumption of discrimination is created and the burden shifts to Defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *See* 411 U.S. at 802. Finally, under the third step, if Defendant carries its burden in articulating a nondiscriminatory reason for the action, then Plaintiff must prove that the proffered reason was actually a pretext for invidious discrimination. *Id.* Plaintiff may establish that the proffered reason was a mere pretext by showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; and 3) that the stated reason was insufficient to explain Defendant's action. *See Wheeler v. McKinley Enters.,* 937 F.2d 1158, 1162 (6th Cir. 1991). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).

## A. *Prima Facie* Case of Discrimination Under 42 U.S.C. § 2000(e)-2

The district court began its analysis by acknowledging that, as an African American, Plaintiff was a member of a protected class. The court then focused on whether Plaintiff suffered an adverse employment action for purposes of satisfying the third element of a *prima facie* case of

party. Because the district court may grant summary judgment only if it is clear that on the undisputed facts, or on the facts viewed in the light most favorable to the non-moving party, the moving party is entitled to judgment, the district court may not weigh the evidence, or make credibility determinations or make any findings of fact in ruling on a motion for summary judgment. And this court may not do so either.

The review of this judgment undertaken by the majority opinion, however, is something other than the de novo review required by the Supreme Court and the precedent of this circuit. In coming to its conclusion that genuine issues of material fact remain for trial, the majority opinion takes judicial notice of "facts" not in evidence, excoriates the defendant for failing to present the evidence in the light most favorable to the plaintiff, holds inadmissible evidence never objected to by the plaintiff either before the district court or before this court, and makes findings of fact. Perhaps most unsettling, the majority opinion says that the district court was required to review the defendant's motion for summary judgment in light of Denny's "past history of discriminatory conduct, both to its minority patrons and employees alike, [which] is well known in the jurisprudence and public forums."[1]

The standard of review of a grant of summary judgment requires that we view the evidence in the light most favorable to the non-moving party; it does not permit us to exclude admissible evidence or that to which no objection was raised below. The majority holds that the affidavits of Randy Poplin and Mary Jean delaVega, the two Denny's employees with the most knowledge about Logan's claim of constructive

---

[1] That Denny's may have previously settled or have been the loser in another proceeding based upon discrimination charges involving entirely different parties and entirely different facts, and even a different geographic locale, is irrelevant at trial in a subsequent proceeding. In this case, the decision at issue was rendered at the summary judgment stage with no evidence of any prior discriminatory conduct by Denny's.

## DISSENT

ALICE M. BATCHELDER, Circuit Judge, dissenting. As the majority opinion emphasizes, this appeal concerns the propriety of the district court's grant of defendant Denny's motion for summary judgment on plaintiff Logan's Title VII claim of racial discrimination based upon alleged constructive discharge. Plaintiff does not challenge on appeal dismissal of her other claims, including state-law claims based upon the same set of facts asserted as a basis for her Title VII constructive-discharge allegation. The majority acknowledges that the district court:

[A]ccurately recognized that in order to show that she suffered a constructive discharge, Plaintiff had to come forward with evidence to demonstrate that the working conditions [because of racial discrimination] under which she labored were so difficult that a reasonable person standing in her shoes would have felt compelled to resign.

Majority Op. at 17.

In this Title VII action, Eileen Logan claims that once she transferred into the Denny's Restaurant in Highland Heights, Denny's discriminated against her and subjected her to a hostile work environment because she is African-American, and that because of Denny's treatment of her, she could no longer work there and was, in fact, constructively discharged. The majority opinion holds that the district court erred in granting Denny's motion for summary judgment. Because I believe that the majority opinion is contrary to law in a number of significant and troubling respects, I must respectfully dissent.

An appellate court reviews de novo a district court's order granting summary judgment. Like the district court, we must view the facts in the light most favorable to the non-moving

discrimination under Title VII. The court recognized that in order to satisfy this element, Plaintiff had to show that she suffered a materially adverse change in her employment, and noted that Plaintiff sought to do so here by claiming that she suffered a constructive discharge. The court also accurately recognized that in order to show that she suffered a constructive discharge, Plaintiff had to come forward with evidence to demonstrate that the working conditions under which she labored were so difficult that a reasonable person standing in her shoes would have felt compelled to resign; and that Defendant intended to cause Plaintiff to resign or that her resignation was a reasonably foreseeable consequence of Defendant's actions.

However, despite its accurate recitation of the law, the district court erred in its analysis because the district court failed to consider any evidence relating to the April 28 incident, which served as the impetus to Plaintiff's resignation. Instead, the court limited its consideration to the various comments made to Plaintiff during her tenure at Highland Heights, such as the "grits" comment, the "first of the month" comment, and the "some of your people" comment, as well as other acts such as Defendant's act of posting the Report in the employee section of the restaurant, and concluded that Plaintiff failed to demonstrate the requirements of a constructive discharge. Then, despite the fact that the district court completely ignored evidence of the April 28 incident in relation to Plaintiff's *prima facie* case, the court found in a footnote that Defendant's proffered reason for taking its disciplinary action – changing Plaintiff's job classification – was not a pretext for race discrimination. In other words, the court was aware of Defendant's claim of Plaintiff's poor performance in relation to the April 28 incident and allowed Defendant to use this evidence as a legitimate nondiscriminatory reason for its actions, but the court refused to consider the evidence as a basis for Plaintiff's constructive discharge claim. We find the district court's analysis erroneous and in complete contravention to the requirement that when deciding a motion for summary

judgment, the evidence – all of the evidence – be viewed in the light most favorable to the nonmoving party.[4]

Having pointed out these deficiencies and errors in the district court's memorandum opinion, we will now analyze Plaintiff's case in the proper light. As stated, under the circumstantial evidentiary pathway, Plaintiff must first establish prove a *prima facie* case of discrimination under Title VII. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). One of the elements she must demonstrate – the element which the district believed Plaintiff failed to establish and therefore found dispositive in granting summary judgment – is that Plaintiff suffered an adverse employment action. *Id.* Plaintiff may establish an adverse employment action by demonstrating that she was constructively discharged. *See Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886-87 (6th Cir. 1996). To demonstrate a constructive discharge, Plaintiff must adduce evidence to

---

[4] We note that the dissent criticizes the majority for inappropriately engaging in fact finding, as well as for improperly requiring Defendant to present the evidence in the light most favorable to Plaintiff. However, a review of the majority opinion reveals that the dissent is wrong on both accounts. First, as will be shown, because the district court completely failed to consider evidence of the April 28 incident in relation to Plaintiff's constructive discharge claim, we have properly brought to the fore the evidence adduced by Plaintiff in this regard, and demonstrated our belief as to why the evidence is sufficient to create an inference of discrimination in the minds of a reasonable juror. This analysis, of course, is precisely the type that we are required to make under a *de novo* review at the summary judgment stage, *see DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999) (noting that the reviewing court must review all of the facts and inferences drawn therefrom in the light most favorable to the nonmoving party); and bringing evidence adduced by Plaintiff, but erroneously disregarded by the district court, to the fore cannot accurately be characterized as fact finding. In addition, the majority in no way implies that Defendant must present the evidence in the light most favorable to Plaintiff; nor does the majority admonish Defendant for failing to do so. Rather, the majority properly takes issue with what we find to be Defendant's misrepresentation of the record. *See Cunningham v. Sears, Roebuck & Co.*, 854 F.2d 914, 916 (6th Cir. 1988). Examples of what the majority believes to be Defendant's misrepresentations of the record are set forth *infra*.

---

("The 1,765-unit Denny's chain, a division of Advantica Restaurant Group, agreed to retrain managers at company locations after facing U.S. Justice Department charges of discriminatory hiring practices.").[9]

Although we recognize that Defendant's past record of discrimination is not at issue here, the fact remains that Defendant is no stranger to race discrimination suits, and the district court's failure to see through Defendant's tactics and recognize the many genuine issues of material fact in this case is disturbing.

## CONCLUSION

The district court erred in granting Defendant's motion for summary judgment where Plaintiff established a *prima facie* case of discrimination under Title VII, and came forward with sufficient evidence to show that Defendant's alleged reason for its action was pretextual. We therefore **REVERSE** the district court's order granting Defendant's motion for summary judgment and **REMAND** the case for trial.

---

[9] *See Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (taking judicial notice of article in the New York Times regarding settlement reached in separate matter in which the appellee was involved, while noting that it was proper for an appellate court to take judicial notice of newspaper articles even when the articles were not before the district court) (citing *Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1356-57 (3d Cir. 1994); *United States v. Pozsgai*, 999 F.2d 719, 731 (3d Cir. 1993)).

*Cunningham v. Sears, Roebuck & Co.*, 854 F.2d 914, 916 (6th Cir. 1988).

We are also troubled by the district court's apparent complacency regarding Defendant's misrepresentations as well as the district court's overall handling of the case. Defendant's past history of discriminatory conduct, both to its minority patrons and employees alike, is well known in the jurisprudence and public forums. Examples of highly publicized cases involving Defendant's discriminatory conduct include two 1994 class action suits alleging race discrimination under 42 U.S.C. § 2000a – *Dyson v. Flagstar Corp.*, C.A. No. 93-1503 from the United States District Court in Maryland, and *Ridgeway v. Flagstar Corp.*, Civ. No. 93-20202 from the United States District Court for the Northern District of California[8] – which Defendant settled for more than fifty-four million dollars pursuant to two consent decrees. *See Savage v. Denny's Inc.*, No. Civ. A. 97-882, 1997 WL 169377, at *2 (E.D. Pa. Apr. 4, 1997) (unpublished); Chris Winston, *Advantica President Steps Down,* Spartanburg Herald, Jan. 5, 2001, at A1. The stated purpose of these decrees is to insure that "'all future customers of company-owned and franchise-owned Denny's Restaurants are accorded equal treatment and service regardless of race and/or color.'" *See McCoo v. Denny's, Inc.*, No. COV.A.98-24558RDR, 2000 WL 156824, at *1 (D. Kan. Feb. 11, 2000); *Savage*, 1997 WL 169377, at *2. In addition, Defendant has come under fire for its discriminatory hiring practices as well. *See* Ron Ruggless, *2000 Year in Review*, 34 Nation's Restaurant News 51 (Dec. 18, 2000)

---

[8]The Maryland case was much publicized and involved a group of black Secret Service agents who received extremely poor service and mistreatment by a server at Defendant's restaurant in Annapolis, while a group of white agents who ordered the same food received top-notch service. When the black agents attempted to complain, members of Defendant's staff allegedly attempted to hide the complaint. The case eventually settled for forty-five million dollars. *See* C. Kalimah Redd, *King Day 2001: Battle shifts, but fight for rights endures More than 700 people turn out in Portland to honor Martin Luther King, Jr.*, Portland Press Herald, Jan. 16, 2001, front page.

show that 1) "the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit . . . ." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

The Fifth Circuit has set forth a number of factors that a court should consider for purposes of satisfying the first prong of the constructive discharge inquiry:

> Whether a reasonable person would have feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (alterations omitted) (quoting *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)). This Court has embraced some of the above-mentioned factors when reviewing a claim of constructive discharge, such as whether the transfer provided for the same duties, pay, and grade level, *see Kocsis*, 97 F.3d at 886; today, we expressly adopt the Fifth Circuit's approach and shall consider the various factors stated above when reviewing Plaintiff's claim.

Plaintiff contends that Defendant's disparate treatment, slanderous statements made to her by coworkers and managers, and Defendant's demotion of Plaintiff from server to busboy rendered Plaintiff's work environment intolerable for purposes of satisfying the first prong of the constructive

discharge inquiry. We begin by focusing on the April 28 incident wherein Defendant changed Plaintiff's job classification because this incident appears to have been the event which ultimately precipitated Plaintiff's resignation. Plaintiff contends that the EPR prepared by Poplin and shown to her by delaVega only made reference to changing Plaintiff's job classification to service assistant. Plaintiff swore in her deposition testimony that Defendant did not offer her the option of becoming a hostess; and that delaVega told Plaintiff that the option before her – the busboy option – was her only choice. Defendant contends that the EPR offered Plaintiff the choice of becoming a hostess or a service assistant (busboy); however, Defendant has not produced the EPR and admitted at oral argument that the EPR has been lost or misplaced. As a result, Defendant supports its contention by way of affidavit from Poplin and delaVega wherein each makes reference to the EPR.[5]

Federal Rule of Civil Procedure 59(e) states that affidavits supporting a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The rule also mandates that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." FED. R. CIV. P. 56(e). "This court has ruled that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir.

---

[5] Specifically, Poplin averred that "[t]he EPR prepared stated that it was being issued due to service-related performance issues and that Ms. Logan was being given the option of moving into either a Hostess or Service Assistant position[;]" while delaVega averred that "[t]he EPR prepared by Mr. Poplin stated that it was being issued due to service-related performance issues and that Ms. Logan was being given the option of moving into a Hostess or Service Assistant position." (J.A. at 146-47.)

a farther commute for Plaintiff – because it was a faster-paced facility and Taylor believed that Plaintiff would do well there. This same deposition testimony cited by Defendant indicates that Plaintiff also sought the advice of John Halasz, who was the manager at Highland Heights and at one time managed Plaintiff at North Randall, and that Halasz informed Plaintiff that he would be "honored" to have Plaintiff transfer to Highland Heights.[7]

Basically, a review of the record cited by Defendant in support of its contentions regarding Plaintiff's abilities and decision to transfer to Highland Heights in no way represents what Defendant suggests. Rather, the record – which is undisputed – is in sharp contradistinction to Defendant's contentions. We find Defendant's mischaracterization of the record, which serves no useful purpose and simply misleads the court, to be unconscionable. This Court has found that misrepresentations of the record made by the appellant's counsel suggests bad faith, and will not be tolerated. *See*

---

[7] The dissent's claim that the majority "does not dispute any of the specific information to which Denny's brief refers" is baffling. We most certainly dispute Denny's statements in its brief that "Ms. Taylor warned Plaintiff that she would find the Highland Heights unit to be different from the North Randall unit" and that "[d]espite these warnings, Plaintiff decided to transfer to the Highland Heights unit[.]" The clear and express implication of these statements, particularly when taken in context with the other statements as quoted above, is to mislead the court into believing that Defendant attempted to caution Plaintiff from transferring to Highland Heights because of the faster pace on the belief that Plaintiff would not be able to handle the faster-paced environment. Indeed, this premise supports Defendant's theory of the case. However, when we examined the unrefuted deposition testimony which Defendant cites in support of this contention, the record indicates not that Plaintiff was "warned" or cautioned against transferring to Highland Heights because of the faster-paced environment, but instead that she was encouraged to transfer to Highland Heights because of its faster pace and Plaintiff's abilities to keep up with this pace. Although Defendant is not required to cast the evidence in the light most favorable to Plaintiff, at the same time it is not allowed to misrepresent the evidence to support its theory of the case, as we believe Defendant has done here.

with the faster pace at Highland Heights.  Specifically, in its brief on appeal,  Defendant states as follows:

> After learning that the North Randall unit would be closing, Plaintiff spoke with John Halasz, the General Manager at a Denny's restaurant located on Wilson Mills Road in Highland Heights, Ohio about the possibility of transferring to that unit.  Plaintiff also spoke with Linda Taylor, her manager at the North Randall unit about the possibility of a transfer to Highland Heights.  During this conversation, Ms. Taylor *warned* Plaintiff that she would find the Highland Heights unit to be different from the North Randall unit.   Specifically, Ms. Taylor told Plaintiff that the Highland Heights unit was a "faster environment" where things were "more structured" than what she was used to.  The reason for the differences between the two units was the fact that the Highland Heights unit was of much "higher volume", meaning that many more customers visited the Highland Heights unit each day than visited the North Randall unit.  This created greater demands on Servers.  Despite these *warnings,* Plaintiff decided to transfer to the Highland Heights unit, where she started working in March of 1996.

Defendant's Brief on Appeal at 6 (citations to record and joint appendix omitted; emphasis added).

When we referenced the citations to the record and joint appendix as provided by Defendant in support of its contention that Plaintiff was "warned" about the higher demands that would be placed upon her if she transferred to Highland Heights, and that she made the transfer despite these "warnings," we were guided to a single document, Plaintiff's deposition testimony.  Upon reading the testimony, we found that it in no way supports Defendant's contention.  In fact, a plain reading of Plaintiff's undisputed testimony states indicates that Taylor *advised* Plaintiff to transfer to Highland Heights as opposed to Garfield Heights – even though the former was much further away from North Randall and meant

1991); *State Mut. Life Assurance Co. of Am. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir. 1979)).

Here, because Defendant failed to attach or produce the EPR to which Poplin and delaVega make reference in their affidavits, the affidavits must be disregarded.[6]  *See* Fed. R. Civ. P. 56(e); *Moore*, 2 F.3d at 699.  This leaves us with delaVega's deposition testimony that the EPR offered Plaintiff the choice of becoming a hostess or a busboy, to contrast with Plaintiff's deposition testimony that the EPR provided only for her transfer to the busboy position.  Viewing the evidence in the light most favorable to Plaintiff, we conclude for purposes of summary judgment that the only job classification offered to Plaintiff was that of service assistant or busboy.  *See Ahlers,* 188 F.3d at 369 (stating that a court may not make credibility determinations nor weigh the evidence when reviewing a motion for summary judgment; rather, the evidence must be viewed in the light most favorable to the nonmoving party, where all reasonable inferences inure to that party's benefit).

---

[6]The dissent makes the claim that the majority is raising the Rule 56(e) argument on appeal *sua sponte.*  However, Plaintiff raised the Rule 56(e) argument in reference to the EPR and the affidavits in question both in her reply brief as well as at oral argument.  To the extent that Plaintiff may not have raised this argument below, this court recognized in *Moore v. Holbrook* that the failure of a party to raise an argument before the district court is not an absolute bar to consideration of the issue on appeal.  *See* 2 F.3d 697, 699 (6th Cir. 1993) (citing *Taft Broad.Co. v. United States*, 929 F.2d 240, 243-45 (6th Cir. 1991)).  The *Taft* court provided an extensive analysis of when an appellate court may disregard the general principle that newly raised issues are not considered on appeal, and noted that one such instance is when "'[t]he issue raised is purely one of law requiring no new or amplified factual determination.'"  *See Taft*, 929 F.2d at 244 (quoting *Black Motor Co. v. Comm'r*, 125 F.2d 977, 980 (6th Cir. 1942)).  Here, as stated *supra*, Defendant admits that it has not produced that EPR and claimed at oral argument that the EPR has been lost or misplaced.  As a result, no new factual determination remains regarding Defendant's failure to produce this document, and we are thus free to consider this purely legal issue.  *See id.*

Accepting as we must that the only offer made to Plaintiff if she wished to remain employed by Defendant was that of service assistant, the inquiry becomes whether a reasonable employee standing in Plaintiff's shoes would have felt compelled to resign given this ultimatum. *See Kocsis*, 97 F.3d at 886; *Brown*, 207 F.3d at 782. This inquiry involves consideration of the non-exclusive list of factors noted above. The first factor to consider is whether a reasonable person would have viewed the job change as a demotion. *See Brown*, 207 F.3d at 782. Although delaVega stated in her deposition testimony that she did not believe that a job change from server to busboy was a demotion, Plaintiff testified in her deposition that she considered the change degrading. Common sense would lead a reasonable person to conclude that the job change was a demotion, because Defendant was allegedly changing Plaintiff's job classification as a disciplinary measure for her poor performance. It therefore logically follows that Defendant was not offering Plaintiff a better position or even a lateral position. At oral argument Defendant claimed that Plaintiff failed to come forward with any evidence, such as the job description of a busboy, to support her contention that moving to this position would have been degrading. However, we can take judicial notice that a busboy or "service assistant" as Defendant entitles it, is a job classification below that of a waiter or server, particularly at this type of restaurant. Although this Court has opined that a demotion in itself does not constitute a constructive discharge, *see Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991), the demotion is significant when coupled with the other factors.

Next, we consider whether Plaintiff would have taken a reduction in salary by transferring to the busboy position. delaVega stated in her deposition testimony that service assistants started at minimum wage with the maximum hourly wage rising to $7.00 or $8.00; while servers began at about $2.00 per hour, and reached a maximum hourly rate of $3.00, plus tips. Because busboys were paid more per hour, delaVega believed the jobs were the same in terms of compensation. However, delaVega's averment is based on

no genuine issue of fact remained for trial as to Defendant's theory, Defendant begins its brief on appeal with a table that continues on for about three pages, wherein Defendant took the individualized sections from each of Plaintiff's performance appraisals over a ten-year period and singled out those categories in which Plaintiff received a "below standards" score. This table, which sets the tone for Defendant's "statement of facts," has a strong impact on the reader inasmuch as one perceives a litany of "below standards" score on any given page. For example, on page four of Defendant's brief, the "below standards" score is listed by Defendant thirty-two times; over the course of nearly three pages, the "below standards" score is listed a total of seventy-two times. Reviewing Defendant's brief leads one to conclude that Plaintiff's overall performance as a server has been poor since she began her employment with Defendant.

However, when we reviewed Plaintiff's performance appraisals in the record, we were left with a much different impression of Plaintiff's skills. As illustrated in this opinion, these very same performance appraisals that Defendant characterizes as being "below standards" were, in some instances, glowing. Only one of the many performance appraisals provided in the appendix indicates an overall score of "below standards." The other performance appraisals indicate an overall score of "at standards" or "above standards," and several of the appraisals bear complimentary remarks as to Plaintiff's abilities such as Plaintiff "is not weak in any areas. She is competent in service, team work and other aspects of the job code, server." (J.A. at 239-40.) These comments also include statements such as, "Overall you're doing great – Keep it up!" (J.A. at 239-40), and "Good job!! We need you more!!" (J.A. at 250.) Defendant conspicuously fails to make mention of these favorable overall scores and comments in its brief, thereby misleading the Court as to Plaintiff's overall rating as a server while employed by Defendant.

Defendant continues to mischaracterize the record in an effort to support its contention that Plaintiff could not keep up

were not going to be cut as a result of Plaintiff's employment, that Defendant began to allege that Plaintiff could not keep up with the pace. In addition, Plaintiff was the only black server to transfer to Highland Heights; only one other server at Highland Heights was black; and the other servers received better hours and sections than Plaintiff. Under these facts, a reasonable person could conclude that Defendant took calculated efforts to portray Plaintiff as being a poor server, and humiliated Plaintiff into resigning because she was a black server who was actually very good at her job and posed a threat to her white counterparts. *See St. Mary's Honor Ctr.*, 509 U.S. at 515.

We are further persuaded in this regard by the timing of the events in question. Specifically, it is undisputed that after ten successful years of employment with Defendant as a server, Plaintiff began working as a server at the Highland Heights facility on March 14, 1996, and that within two weeks she received an "above standards" performance evaluation and a pay increase. Yet, Defendant contends that by April 28, 1996, Plaintiff's performance was so poor that Defendant could no longer employ Plaintiff in this capacity. In another words, according to Defendant, in just two or three weeks Plaintiff went from being a server functioning at "above standards" capacity, to being a server who was no longer capable of performing her job. Defendant attributes Plaintiff's lack of success to the faster-paced environment of the Highland Heights restaurant. However, we find Defendant's contention illogical. If Plaintiff could not keep up with the pace, it is reasonable to believe that the most difficult period for Plaintiff would have been when she first arrived at Highland Heights, and that after she got accustomed to the faster pace, her performance would have improved. However, Defendant would have us believe the opposite to be true.

Defendant's theory is that Plaintiff was a poor server who could not keep up with the pace at Highland Heights, and that it benevolently offered to make Plaintiff a busboy as opposed to terminating Plaintiff because of her more than ten-year employment history. In an attempt to convince the court that

---

speculation inasmuch Defendant failed to marshal any evidence as to how much money Plaintiff made in tips in an average day, or how much money any server working for Defendant makes on the average. Because Plaintiff would lose the ability to make tips as a busboy, it is reasonable to conclude that she would have suffered a reduction in salary by changing to this job classification.

Similarly, a common sense understanding this type of restaurant would lead a reasonable person to believe that Plaintiff's job responsibilities were reduced by changing her job from that of server to busboy. As Plaintiff testified, the busboys wear rubber boots, mop floors, clear and lift heavy dishes, and clean-up after people; while the servers wait on customers and deliver food to them. Moreover, Defendant admitted that it was changing Plaintiff's job classification because of Defendant's alleged perception of Plaintiff not being able to satisfactorily perform as a server, and the duties of a busboy were less than those of a server.

Regarding the next factor, reassigning to menial or degrading work, we find that although working as a busboy from the outset may not be considered menial work by some, a reasonable person standing in Plaintiff's shoes may have found the job menial. Had Plaintiff accepted that busboy position, she would have gone from waiting on customers and serving meals – a job that she had successfully performed for over ten years – to mopping floors.

As to the next relevant factor, badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, we conclude that not only was the job change in itself humiliating, but the manner in which Plaintiff was informed of this change was humiliating as well, and done in a way calculated to encourage Plaintiff to resign. For example, on the day in question, Plaintiff reported for work in the usual course, but when she looked on the schedule for her station assignment, she noticed that she was assigned to "station eight." Plaintiff found this odd because to the best of her knowledge, "station eight" did not exist at the restaurant.

This discrepancy caused Plaintiff to go the manager's office where she was then informed by delaVega of the job classification change. We find Defendant's use of the term "station eight" as a mechanism to bring Plaintiff to the manager's office very suspect in that the term "section eight" is a well known military term meaning that an enlisted person had been discharged because of mental instability. *See Cloth v. Hyman*, 146 F. Supp. 185, 190-91 (S.D.N.Y. 1956) (reviewing claim for copyright infringement on spoof "Bucking for Section 8" while noting that "[t]he title refers to 'Section 8' which is the basis for discharge as a mental case"). Although the use of this term may be coincidental, an inference of intended humiliation can be drawn where Defendant could have used several other methods or fictitious section numbers as a means to draw Plaintiff to the manager's office before her shift. Instead, Defendant engaged in a form of suspect trickery which in itself would place Plaintiff in a humiliated state such that Plaintiff would be even more vulnerable, and therefore likely to resign, when delaVaga delivered the news.

In addition, once in the office, Plaintiff was totally blind sided by what delaVega had to say. According to Plaintiff, usually servers were "written-up" for poor shopper reports, and she had never heard of any other server being demoted for such a report. Furthermore, delaVega did not explain that this job change was temporary, nor was delaVega receptive to Plaintiff's offer to get further training. Accepting Plaintiff's version of the events, as we must at this stage, we conclude that a reasonable person standing in Plaintiff's shoes would have felt embarrassed and humiliated at the prospect of having to bus tables for the servers with whom she once worked – particularly when all but one of the servers were Caucasian.

This leads to the final relevant factor, whether Defendant offered Plaintiff continued employment on terms less favorable than the employee's former status. Again, it is completely reasonable to conclude that clearing dishes, wiping booths and tables, mopping floors, and cleaning up

purported reason for its action – Plaintiff's alleged poor performance as a server – was a mere pretext for this alleged invidious discrimination. *See Johnson*, 215 F.3d at 578.

## B.   Pretext for Discrimination

As stated, a plaintiff may establish that the proffered reason was a mere pretext by showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; and 3) that the stated reason was insufficient to explain the defendant's action. *See Wheeler,* 937 F.2d at 1162. "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

Defendant contends that its disciplinary action taken against Plaintiff was necessary based on alleged complaints that it received from customers regarding Plaintiff's performance, the Report, and Poplin's observation of Plaintiff. However, like the EPR, Defendant has failed to produce any of these alleged customer complaints, or any evidence that Plaintiff was counseled about them before the April 28 incident. Plaintiff, on the other hand, has come forward with sufficient evidence to establish that Defendant's proffered reason for her discharge – her poor performance due to inability to work at a faster-paced facility – was a pretext for race discrimination. For example, Plaintiff adduced numerous favorable performance appraisals from the North Randall facility, as well as unrefuted testimony that her manager at North Randall encouraged Plaintiff to transfer to the Highland Heights facility because it was a faster-paced branch; and unrefuted testimony that the manager at Highland Heights, John Halasz, who at one time managed the North Randall facility, told Plaintiff that he would be honored to have her transfer to Highland Heights. She also adduced the unrefuted claim that she received a favorable performance review and pay increase shortly after arriving at Highland Heights. It was not until management and the other servers began making disparaging comments and made their feelings known that their hours

344, 352 (6th Cir. 1998) (cautioning that the "similarly situated" inquiry should not "invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment;" rather, the inquiry should focus on whether the plaintiff's employment status is "similar in all of the relevant aspects"). In other words, once Plaintiff transferred to the Highland Heights facility, she was in the same position as her white counterparts; indeed, she was held to the same performance standards as her white counterparts. However, questions of fact remain as to whether she was treated less favorably than the non-minority servers.

For example, Plaintiff claims that in her more than ten years of employment with Defendant, although she had seen other servers "written up" for unfavorable Mystery Shopper Reports, she knew of no other servers who were required to become busboys if they wished to continue with their employment. In addition, aside from one other server who was employed part-time, Plaintiff was the only African-American server, and she claims that the white servers were given better hours and more favorable work stations. Although Plaintiff testified that Defendant attempted to correct the disparity in hours and work stations, Plaintiff also testified that Defendant did not continue to adhere to the corrective measures. Plaintiff also related the incident where she was denied the use of a tie for the evening based on her manager's representation that he did not have an extra tie, and yet the manager provided a white server a new tie (i.e., a tie in addition to the one she was wearing) about an hour after Plaintiff made her request. These incidents create a factual dispute for purposes of surviving summary judgment as to whether similarly situated non-minority servers were treated more favorably than Plaintiff. *See Ercegovich,* 154 F.3d at 352.

Because Plaintiff adduced sufficient evidence to establish a *prima facie* case of race discrimination under Title VII, the next step in the analysis is to determine whether Plaintiff came forward with evidence to show that Defendant's

after customers for minimum wage is a less favorable job than being a server for an hourly rate and tips. Accordingly, when viewing these factors in combination, we find that Defendant's act of conditioning Plaintiff's continued employment on her becoming a busboy created an intolerable work condition such that a reasonable person standing in Plaintiff's shoes would have felt compelled to resign. *See Moore*, 171 F.3d at 1080.

Although we believe that the April 28 incident was sufficient to meet the first prong of the constructive discharge inquiry, we are further persuaded in this regard inasmuch as the April 28 incident came on the heels of Plaintiff experiencing disparaging comments and alleged incidents of unfair treatment. *See Jackson v. Quanex*, 191 F.3d 647, 659 (6th Cir. 1999) (noting that a claim for race discrimination must be viewed under the totality of the circumstances). As stated, shortly after transferring to Highland Heights, Plaintiff claims that she began experiencing comments from management and co-workers such as "We don't serve 'grits' here;" "You're probably used to that 'first of the month rush,'" implying that many of the customers from the facility where Plaintiff was employed in North Randall were on public assistance; and "These must have been some of your people from Randall," in reference to some customers who did not want to pay for their breakfast. (J.A. at 196.) Although Plaintiff testified in her deposition that the "your people" comment was made in reference to customers who refused to pay for their food, a practice that allegedly happened often at North Randall, evidence on the record indicates that the clientele at North Randall was of low economic means and that many may have been minority group members. Therefore, we find that this comment carries an inference of invidious discrimination sufficient to create a question of fact as to whether the comment was harassing and created an intolerable atmosphere. *See Brown*, 207 F.3d at 782. The same may be said for the "grits" comment and the "first of the month" comment.

In addition, during her deposition, Plaintiff related an incident wherein she asked her manager, Greg Mallon, if he had a spare tie for her to use for the evening because she had left her tie at home. Mallon informed Plaintiff that he did not have a spare tie and that she would have to go home if she was not properly attired. However, about an hour later, Mallon gave a new tie to a young white server who excitedly displayed the tie to Plaintiff. Plaintiff testified that her feelings were hurt by this incident. Like the disparaging comments made to Plaintiff, we find this incident to create an issue of fact as to whether a reasonable person would have felt badgered, harassed, or humiliated for purposes of creating an intolerable environment. *See Moore*, 171 F.3d at 1080 (finding that to determine whether there has been a constructive discharge, both the employee's objective feelings and the employer's intent must be examined); *Brown*, 207 F.3d at 782. The same may be said of Defendant's posting the Mystery Shopper Report in the employee section of the restaurant. Plaintiff admitted that she had seen other unfavorable reports posted in the past that did not involve her, but that she had not seen a report that bore comments such as those made by management on her Report.

In summary, Plaintiff adduced more than sufficient evidence to create an issue of fact as to whether Defendant deliberately created intolerable working conditions as perceived by a reasonable person, for purposes of meeting the first prong of the constructive discharge inquiry. *See Moore*, 171 F.3d at 1080. We also are persuaded that this evidence creates an issue of fact as to the second prong of the inquiry, whether Defendant created these conditions "with the intention of forcing [Plaintiff] to quit . . . ." It is completely foreseeable that a reasonable person would have resigned under these circumstances. *See id.* (finding that the defendant's act of increasingly isolating the plaintiff and not communicating with him after the plaintiff filed an EEOC complaint was sufficient evidence for a jury to conclude that the defendant intended for the plaintiff to resign; "[d]ay after day, week after week of isolation . . . would lead him to believe that he was no longer wanted"). Indeed, Defendant's

comments to Plaintiff referring to customers from North Randall, as well as its act of treating other servers more favorably could lead Plaintiff to believe that she was not wanted at the Highland Heights facility, particularly when there was only one other African-American server, who was part-time. When these incidents are coupled with Defendant's conditioning Plaintiff's employment on her becoming a busboy, we conclude that Plaintiff marshaled copious evidence that a reasonable person standing in Plaintiff's shoes would have felt that compelled to resign, and that Defendant intended for Plaintiff to do so.

Plaintiff therefore adduced sufficient evidence of a constructive discharge for purposes of satisfying the adverse employment action element of her *prima facie* case. In addition, although not addressed by the district court in its abbreviated analysis, Plaintiff adduced sufficient evidence on the other elements of her *prima facie* case so as to survive summary judgment. Specifically, Plaintiff is African American and therefore a member of a protected class; she adduced sufficient evidence through her numerous favorable performance appraisals over a more than ten-year period with Defendant that she was qualified to work as a server; she adduced evidence that she suffered a constructive discharge for purposes of demonstrating an adverse employment action; and she adduced evidence that other members outside the protected class were treated more favorably. *See Johnson*, 215 F.3d at 578.

Defendant argues extensively in its brief on appeal that Plaintiff failed to come forward with evidence to create a genuine issue of fact for trial that non-minority co-workers were treated more favorably than Plaintiff, inasmuch as the co-workers to whom Plaintiff makes reference were not servers who transferred from other facilities. We are not persuaded by Defendant's claim because once Plaintiff transferred to the Highland Heights facility, she bore the same job title and was required to perform the same duties for the same managers as the servers who had already worked there. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d