NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0122n.06
Filed: February 14, 2006

No. 05-3247

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GWENDOLYN O. BROWN,                  )
                                     )       ON APPEAL FROM THE UNITED
          Plaintiff-Appellant,       )       STATES DISTRICT COURT FOR
                                     )       THE   NORTHERN DISTRICT OF
          v.                         )       OHIO
                                     )
BANK ONE, N.A.,                      )
                                     )
          Defendant-Appellee.        )
_____ _____

BEFORE:  SUHRHEINRICH and GRIFFIN, Circuit Judges; and HOOD, District Judge.[*]

     PER CURIAM.

     Plaintiff Gwendolyn O. Brown appeals a summary judgment entered in the district court in

favor of Bank One, N.A. on her claims of employment discrimination based on race in violation of

Title VII (42 U.S.C. §§ 2000e-2000e-17), and its state counterpart, OHIO REV. CODE § 4112.02.[1]

Brown contends that the court improperly applied the summary judgment standard by weighing the

evidence and construing inferences in the Bank's favor.  For the reasons set forth below, we affirm

the district court's entry of summary judgment.

_____

     [*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

     [1]Brown also asserted a supplemental state law claim of wrongful discharge in violation of
public policy.  She does not appeal the district court's entry of summary judgment in Bank One's
favor on that claim.

I.

A.      *Plaintiff's Tenure with Bank One*.

Plaintiff Gwendolyn O. Brown, an African-American female, began work for the Akron,

Ohio, based Firestone Bank, defendant Bank One's predecessor, in 1974.  Following Bank One's

purchase of Firestone, Brown remained at Bank One working in various positions until April 1998

when she assumed the position of "Relationship Banker" (hereinafter "RB") at the Montrose Bank

One branch.[2]  As an RB, Brown was supervised by the Banking Center Manager and evaluated

pursuant to various objective criteria, such as the number of calls placed to clients, the number of

scheduled appointments, and the number of client opportunities acquired.  Based on those criteria,

Brown was rated as "meets expectations" in April 2000.

In late 2000, after the Montrose branch closed where she served as one of three Relationship

Bankers, Brown was reassigned to the Akron Square branch.[3]  In March of 2002, Bank One

published the 2002 Banking Center Incentive Plan ("the 2002 Plan"), which announced new,

uniform standards for Managers, Assistant Managers, Relationship Bankers, and Customer Service

---

[2]A "Relationship Banker" works to address customers' financial services needs, places
business development calls, seeks out additional sales opportunities, and is responsible for customer
retention by ensuring that existing customers are effectively managed.

[3]Brown worked with Robin Allison- Knight, an African-American female hired in May 2001,
and Kathy Markowski, a Caucasian female hired in September 2002.  Given that Brown has relied
heavily on the tenures of Allison-Knight and Markowski in an effort to show disparate racial
treatment, their employment with Bank One is discussed below.  Neither Allison-Knight nor
Markowski are parties to this litigation.

Assistants.[4] The 2002 Plan established monthly sales goals for RBs in four separate financial service areas. The 2002 Plan also required RBs to earn a minimum of 400 "Product Value Credits" ("PVCs") per month.[5] An RB became entitled to an incentive bonus if the RB met 50% of his or her monthly sales targets and earned 400 PVC points.[6] For the first six months of the 2002 Plan, an employee's performance was tracked, but employees were not disciplined for failure to meet any Plan requirements.

From March 2002 - September 2002, Brown accrued a total of 2,760 PVCs, or an average of 394 PVCs per month. During that period, Brown exceeded 400 PVCs on four occasions. On October 1, 2002, Branch Manager Kelly Chaney met with Brown to discuss her performance to date and the two reviewed a form entitled "Corrective Action Process."[7] On that form, contrary to Brown's charted accomplishments and seemingly contrary to the Plan's decree that employees were not to be disciplined within the first six months, Chaney handwrote that "Gwen has only met two

_____

[4]Kelly Chaney, Brown's branch manager, concluded that Brown's 2001 performance "met expectations," though barely; on a scale of 1 to 2.75, where a score of 1.60 "meets expectations," Brown received a 1.61. In Brown's next evaluation, covering the first three months of 2002, she received a 1.62.

[5]The RB could earn Product Value Credits by selling certain products, such as checking/savings accounts, CDs, investments, consumer or business loans, or credit cards.

[6]A newly-hired RB was required to earn 300 PVCs per month for the first three months of their tenure.

[7]The form is dated September 30, 2002. The form corresponds to the first stage of Bank One's disciplinary process, entitled the "Documented Discussion" phase. As discussed below, an employee whose job performance remains substandard subsequently receives a "Written Counseling" session, during which another "Corrective Action Process" document is reviewed. Finally, an employee receives a "Final Written Warning."

months of her sales goals & PVC goals."[8]  Also during their meeting, Chaney provided Brown with

handwritten suggestions on how Brown might improve her performance, such as placing forty

outbound calls per week, three business calls per week, consistently using a planner for follow-up,

profiling every business opportunity, and scheduling weekly meetings with Chaney.  The Corrective

Action Process form cautioned that Brown's "conduct will be monitored over the next  60  days.

Failure to raise your work performance/conduct to an acceptable level within that time will result

in further corrective action, up to and including termination of your employment."

On November 5, 2002, Chaney commenced another disciplinary action seeking to rectify

Brown's job performance, this time in the form of a "Written Counseling."  In conjunction with this

action, Chaney drafted another "Corrective Action Process" form, which documented Brown's

failure to make sufficient daily business contacts, schedule the minimum monthly appointments, and

adequately profile business opportunities.  The form also outlined Chaney's expectation that Brown

would "earn a minimum of 500 PVCs in November and 600 in December 2002."[9]  Similar to its

predecessor, the November 5 Corrective Action Process form cautioned that Brown's "conduct will

---

[8]Bank One's brief relies on the "Corrective Action Process" document for the proposition that Brown met her PVC monthly goal just twice during the six month trial period.  The chart reflecting Brown's performance for the Plan's first six months, however, from March through August, reflects that Brown actually met her PVC target goal four out of a possible six times. Brown failed to meet her PVC goal in September, following which Chaney authored the "Corrective Action Process" document.

[9]According to Brown, the PVC increase was an increase applicable to *all* RBs.  As her deposition testimony reflects, "[t]he actual figure, 500 and 600, it was my understanding that [Chaney] didn't put that in place, I believe that was what our PVCs were.  I don't think she could change that."

be monitored over the next __90__ days. Failure to raise your work performance/conduct to an acceptable level within that time will result in further corrective action, up to and including termination of your employment." Although Brown refused to sign the November 5 Corrective Action Process form,[10] she agreed that she was not meeting all of the goals.

On January 14, 2003, Chaney determined that Brown had not sufficiently improved her job performance and therefore issued her a Corrective Action process form, which included "Final Written Warnings." The Warnings documented that Brown again failed to earn sufficient PVCs in November and December 2002, schedule appointments, and make new business contacts. In addition to outlining new sales goals for Brown, the Warnings stated that Chaney would cover for Brown for one hour on a daily basis to allow Brown to make outgoing business phone calls.[11] Following the January 2003 Warnings, Brown earned 600 PVCs in January and 300 PVCs in February and, as a result, Chaney asked Brown whether she would accept a demotion. After Brown declined the demotion, Chaney and District Manager Christine Kelly met with Brown on March 13, 2003, and informed her that she had the option of being terminated or submitting her resignation. Brown elected to resign, and, accordingly, the Bank provided her with two weeks severance pay. The Bank replaced Brown with a white female.

---

[10]Brown apparently refused to sign "[b]ecause of the time frame that I was supposedly allotted to get these actions into place, it was accelerated from what I was given and I wouldn't sign, that was the reason."

[11]At the time of the Final Written Warnings, the Bank had recently implemented the 2003 Relationship Banker Sales Incentive Plan, which required RBs to immediately begin earning at least 750 PVCs per month.

B.     *Robin Allison-Knight's Employment with Bank One*.

Robin Allison-Knight is an African-American female who was hired to work as an RB for Bank One beginning in May 2001. *See* Note 3, *supra*. She, too, had difficulty adapting to the PVC incentive program and, on September 30, 2002, Chaney commenced a "Documented Discussion" with Allison-Knight. On a "Corrective Action Process" form, reflecting Allison-Knight's performance during the 2002 Plan's trial period, Chaney handwrote that "Robin has consistently failed to meet her required sales goals as well as her PVC goal." Allison-Knight also received a copy of Chaney's handwritten "Behaviors to be successful" and was cautioned that her performance would be monitored over the next sixty days.

On November 5, 2002, Chaney commenced a "Written Counseling" disciplinary action seeking to rectify Allison-Knight's job performance. On that form, Chaney wrote that Allison-Knight had failed to make ten business contacts per day, attain monthly minimum PVCs, schedule two appointments per day, and sufficiently profile business sales opportunities. Like Chaney's expectations for Brown, Chaney wrote that "[i]t is expected that you earn a minimum of 500 PVCs in November and 600 in December 2002." Allison-Knight signed the November 5 Corrective Action Process form.

By March 2003, Allison-Knight had achieved her PVC goal only twice in eleven months.[12] On May 1, 2003, Chaney provided her with the option of resigning or being terminated. Allison-Knight elected to resign that same day and was replaced by a white female.

C.      *Kathy Markowski's Employment with Bank One.*

Kathy Markowski is a Caucasian female who was hired to work as an RB for Bank One beginning in September 2002. Although she successfully exceeded the 300 PVC minimum during her three-month trial period, *see* note 6, *supra*, Markowski thereafter met her PVC goal only three times in six months. Consequently, Chaney spoke with Markowski on April 17, 2003, concerning Markowski's job performance. Chaney warned Markowski that she was not fulfilling her daily minimum job requirements and her continued failure to do so may result in further corrective action.

Chaney subsequently provided Markowski with a "Final Written Warning" on May 1, 2005. Markowski's final warning observed that she failed to meet minimum PVC goals, document business contacts, place sufficient outgoing business calls, and schedule daily appointments. Then, before Markowski sought to begin maternity leave in May, Chaney asked whether Markowski would consider a demotion. Markowski accepted the demotion and was transferred to Summit Mall. She was replaced by an African-American female.

D.      *Procedural History.*

---

[12]Significantly, Allison-Knight was on maternity leave from January 31, 2003, until March 17, 2003.

As a result of the foregoing, Brown filed a complaint on December 22, 2003, with the Summit County Court of Common Pleas, alleging race discrimination in violation of 42 U.S.C. § 2000e and Ohio Revised Code § 4112.02, and wrongful discharge in violation of Ohio public policy. The Bank thereafter removed the action to federal court on January 26, 2004, and filed for summary judgment on July 12, 2004.

On January 19, 2005, the district court granted summary judgment in the Bank's favor on all counts. In doing so, the court found that, although Brown successfully established a prima facie case of employment discrimination, the Bank had properly asserted a legitimate non-discriminatory reason for Brown's termination. Specifically, the court observed that "[t]he criteria under [the PVC] program were objective, and based on measurable performance in relation to sales goals of bank products or services." The court also highlighted that "[a]ll three [RBs] faltered in meeting the PVC monthly goals as they were progressively increased from 400 to 750 points, and all three were forced to leave their positions in relationship banking for under performance."

The court therefore held that the burden shifted to Brown to demonstrate that the Bank's asserted reason was merely a pretext for discriminatory motives. The district court, after comparing Brown's performance to Markowski's, concluded that "[t]he timing of the adverse employment action was the same for both Brown and Markowski, and the time of adverse employment action is what is material." Although Brown challenged the validity of the PVC program, the court observed that "whether the PVC goals were reasonably set and attainable is irrelevant, so long as Bank One

applied them equally in this disparate treatment case." Accordingly, the court concluded that awarding summary judgment in the Bank's favor was appropriate. This timely appeal followed.

II.

Brown asserts that her work quality was equal or superior to her colleagues and, as a result, Bank One committed an act of racial employment discrimination by terminating her and replacing her with a white female. As her sole issue on appeal, Brown contends that the district court, in evaluating Brown's contentions, improperly weighed evidence in favor of the Bank. Brown argues that, contrary to the court's evaluation, the Bank's asserted non-discriminatory reason was, in fact, merely a pretext for discrimination. As Brown states, "[t]he PVC goals that Bank One touted as their *raison d'etre* were not objective in their formulation or their application." Brown alleges that Bank One failed to adequately characterize or firmly define PVC goals.

More importantly, Brown argues, Bank One defined PVC goals differently for herself and Allison-Knight. Brown observes that "Chaney disciplined and terminated Brown and Allison[-Knight] for failing to meet PVC goals as if those goals were true standards that must be met; yet, [Chaney] testified that the PVCs were aspirational goals to meet if an RB wanted to receive a monetary bonus." Morever, according to Brown, Chaney (1) inappropriately disciplined Brown and Allison-Knight during the Plan's trial period,[13] (2) shortened the time within which she expected

---

[13]Brown, relying on a Bank answered interrogatory, argues that any form of discipline arising from her performance during the trial period was improper. The Bank's answer to the interrogatory, however, simply indicates that no discipline would occur during the trial period, which is far different from saying that no discipline would occur as a result of work *performed* during the trial period.

Brown and Allison-Knight to meet professional goals,[14] (3) ignored Markowski's performance

deficiencies, and (4) set increasingly demanding standards for Brown and Allison-Knight. Thus,

Brown concludes, "Chaney's zeal to discipline her black RBs [], contrasted with her laxity in issuing

discipline to Markowski, should have raised a question with the trial court as to whether the PVC

goals were truly important, and whether their importance varied depending upon an RB's skin

color."

This Court reviews the district court's entry of summary judgment de novo. *McWane, Inc.*

*v. Fid. & Deposit Co. of Md.*, 372 F.3d 798, 802 (6th Cir. 2004). Summary judgment is proper when

there are no genuine issues of material fact in dispute and the moving party is entitled to judgment

as a matter of law. FED. R. CIV. P. 56(c). A genuine issue for trial exists only when there is

sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty*

---

[14]Brown's complaint about the timing of her disciplinary action is meritless. She notes that the October 1, 2002, Corrective Action Process "promised" her a certain amount of time to rectify her conduct. Thus, according to Brown, the November 5 Corrective Action process was premature. The Bank's "Conduct and Performance Standards Policy," however, expressly provides as follows:

> The corrective action process may be advanced at any point if the employee does not demonstrate sufficient progress, if the same or similar error occurs, or if any other policy violation occurs. In addition, a manager may bypass stages in the process if the circumstances and severity of an offense warrant doing so.

Moreover, the counseling notices provided to Brown cautioned that "[f]ailure to raise your work performance/conduct to an acceptable level within that [written] time will result in further corrective action, up to and including termination of your employment." Such policy makes sense given that Brown had the protections only of an at-will employee. *See Sneyd v. Int'l Paper Co., Inc.*, 142 F. Supp. 2d 819, 823 (E.D. Mich. 2001) (noting plaintiffs who were at-will employees "had no legitimate expectation of job security").

*Lobby, Inc*., 477 U.S. 242, 252 (1986); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (noting that, in deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the non-moving party).

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "because of . . . race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (2000).  As a general premise, Title VII cases obligate a plaintiff to demonstrate that defendant intentionally discriminated against the plaintiff.  *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000). Although unlawful discrimination need not be the only reason for an adverse employment action, it must be a fundamental component of an employer's motive.  *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) ("Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations.").

A plaintiff may establish a claim of illegal discrimination either through direct or circumstantial evidence of discrimination.  *Kline v. Tenn. Valley Auth*., 128 F.3d 337, 348-49 (6th Cir. 1997) ("The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both.").  Where, as here, no direct evidence of discrimination exists,[15] this Court employs the three-part test set forth in *McDonnell Douglas Corp.*

---

[15]At her deposition, Brown testified in part as follows:

Q:      At any time during the two plus years that you worked with Kelly Chaney, did      you ever hear her make any kind of a racial slur?
A:      A racial slur?
Q:      Yes.
A:      No, not that I know of.

*v. Green*, 411 U.S. 792 (1973), as later clarified by *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), wherein a plaintiff must first establish a prima facie case of discrimination, *McDonnell Douglas*, 411 U.S. at 802. Assuming a plaintiff establishes her prima facie case of discrimination, the defendant must "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id*. Only if a defendant accomplishes this feat must a plaintiff thereafter prove that the proffered reason was merely a pretext for invidious discrimination. *Id*. "Plaintiff may establish that the proffered reason was a mere pretext by showing that 1) the stated reason had no basis in fact; 2) the stated reason was not the actual reason; and 3) that the stated reason was insufficient to explain Defendant's action." *Logan v. Denny's, Inc*., 259 F.3d 558, 567 (6th Cir. 2001) (citing *Wheeler v. McKinley Enters*., 937 F.2d 1158, 1162 (6th Cir. 1991)).

In this case, the district court found, and the parties do not dispute, that Brown established her prima facie case of employment discrimination. Accordingly, the burden shifts to the Bank to articulate a legitimate, nondiscriminatory reason for terminating Brown's employment. *McDonnell Douglas*, 411 U.S. at 802; *see Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (noting that a defendant's decision to terminate the plaintiff's employment must have been a "*reasonably informed and considered decision*" (citation omitted)). The Bank asserts, as its nondiscriminatory reason, that Brown's performance as an RB was measured by objective sales goals. Brown, however, takes issue with the so-called "objective" sales goals, maintaining that

---

Q:     Ever anything derogatory, any kind of inappropriate statement based on race
       either to you or anyone else?

A:     No, not that I know of.  Didn't hear her say it.

the PVC program fails to clearly define expectations and, as applied, has a racially discriminatory impact.

Some of Brown's criticisms of the PVC program are well taken. From an objective standpoint, the PVC may be confusing, and arguably sets employees up for failure by tacitly requiring employees to fulfill lofty sales goals, and unclearly sets forth employee expectations. For example, the literature describing the 2002 Plan describes the PVC program in misleading terms as an *incentive* program, rather than a program of mandatory minimum sales goals. Indeed, the Relationship Banker portion of the 2002 Plan provides as follows:

> Each month, to qualify for an incentive payment, TWO THINGS must occur:
>
> 1) You must reach at least 50% of your monthly target in three of the four Product Categories listed above.
> 2) You must accrue a minimum of 400 Product Value Credits for the month. Credits are earned based on the product schedules on page 11. They will include what you've sold from the list of Special Sales & Referrals.
>
> IMPORTANT: You will not receive a monthly incentive payment if you aren't able to meet both of these requirements.

Noting that an employee will not receive a bonus by failing to accomplish lofty sales goals is far different from stating that such failure may expose them to employment termination.

As the district court recognized, however, "whether the PVC goals were reasonably set and attainable is irrelevant, so long as Bank One applied them equally . . . ." *See generally Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (noting that policy of preventing nonmarital sexual activity among faculty at religious school, if applied equally to male and female employees, is not a violation of Title VII); *O'Neal v. Johns Manville Int'l*, No. 3:04CV7255, 2005

U.S. Dist. LEXIS 10114, *28 (N.D. Ohio May 20, 2005) ("[W]hile defendant may justifiably terminate an individual who has reported to work while under the influence of alcohol and refused to submit to a test, defendant may do so only if its drug and alcohol policy is applied equally, regardless of race." (citation omitted)).

The evidence reflects that, although the PVC program was likely an example of bad policy, it was not in any way racially discriminatory and the Bank did not enforce it in a discriminatory manner. Despite Brown's arguments to the contrary, the simple reality is that all three employees – Brown, Allison-Knight, and Markowski – underachieved as RBs pursuant to the 2002 and 2003 Plans and, as a result, their employment as RBs was terminated. Although, as noted above, the Plans themselves did not warn that PVC deficiencies could lead to demotion or termination, that possibility should have become abundantly clear to Brown during her numerous meetings with Chaney. Indeed, because of Bank One's elaborate four-step disciplinary process, Brown was provided with several opportunities to correct her behavior.

Several other points bear noting. First, although Brown complains about her termination, Brown elected termination in lieu of a demotion. Second, although Brown contends that Markowski received preferential treatment, Markowski was demoted at step two (written warning) of the disciplinary process, whereas Brown was offered a demotion only after Chaney performed all four Bank One disciplinary steps. Finally, and perhaps most importantly, Brown's deposition testimony reflects that she declined to directly accuse her supervisor of racial discrimination and, instead,

indicated her belief that Chaney's suggestions for improvement were genuine and designed to help Brown succeed.

The analysis therefore turns to the third step of the *McDonnell Douglas* framework, wherein Brown must introduce evidence to create a genuine issue of material fact that (1) the Bank's stated reasons had no basis in fact, (2) the stated reasons were not the actual reasons, or (3) the stated reasons were insufficient to explain the defendant's actions. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000); *see Reeves*, 530 U.S. at 143 (noting that, at the third step, the presumption of discriminatory intent "drops out of the picture" (internal citation and quotation marks omitted)). Brown falls far short of her burden to demonstrate pretext; indeed, she essentially relies on the same facts she proffered in support of her prima facie case. She again argues that the PVC program was not objective in its formulation or application and, as examples, she points to (1) the various methods the Bank used to define PVC goals, and (2) the manner in which Chaney treated Brown and Allison-Knight as compared to her treatment of Markowski. For the reasons stated above, however, these arguments are not sufficient to demonstrate that the Bank's asserted nondiscriminatory reason for Brown's termination from Bank One was somehow a pretext for racial discrimination.[16]

---

[16]Brown does not discuss her claim pursuant to OHIO REV. CODE § 4112.02, presumably because a race-based employment claim in Ohio is evaluated pursuant to the same standards federal courts use to evaluate discrimination claims pursuant to Title VII. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n.*, 421 N.E.2d 128, 131 (Ohio 1981) ("[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) *et seq*., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R. C. Chapter 4112." (citation omitted)). It therefore follows that because we affirm the district court's grant of summary judgment

Affirmed.

to the Bank on Brown's Title VII claim, we likewise affirm the court's similar grant on Brown's state statutory claim.