NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0088n.06

No. 17-3441

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 23, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| SHANNON M. GOSBIN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| JEFFERSON COUNTY COMMISSIONERS, | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE:    SUHRHEINRICH, GRIFFIN, and THAPAR, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

Plaintiff Shannon Gosbin,[1] former Director of the Jefferson County Water & Sewer Department ("Department"), claims that, because of her gender, she was wrongfully suspended and eventually forced to resign by Defendant Board of Jefferson County Commissioners[2] ("Commissioners" or "Board"). Although the district court found that the Board's reason for her suspension was unsupported by the record, it held that Plaintiff had not made out a prima facie case because she failed to identify a similarly-situated male who was treated differently. The court also found no proof to support her constructive discharge claim. Therefore, it granted summary judgment to the Board. She appeals that decision. For the following reasons, we affirm.

---

[1] Plaintiff's first name is spelled "Shannon" in the caption. However, in many portions of the record it is spelled "Shannan."

[2] Plaintiff's complaint is against the "Jefferson County Commissioners." The legal entity being sued is the Board of County Commissioners for Jefferson County, Ohio.

## I.   BACKGROUND

### A.  Facts

In 2004, Plaintiff earned a bachelor's degree in applied science with a major in civil and construction engineering technology.  She was hired by the County in March 2008 as Assistant Director of the Department, by then-Director Jack Gilmore.  After Gilmore retired in late 2009, Defendant Commissioners Thomas Graham, David Maple, and Thomas Gentile appointed Plaintiff as Interim Director, and then Director in August 2010.

In June 2013, the owner of a local septage hauling business asked Gentile if he could dump septage at a County plant because another private company, Miller Septic, was allowed to dump at a County facility.  Gentile asked Plaintiff to investigate the Miller Septic dumping arrangement.  She did so and reported back to the Board by memorandum dated June 12, 2013.  That memorandum explained that the County once had its own vacuum truck, and when it did, no septic haulers were allowed to dump at the County plant.  When the vacuum truck broke down, rather than replace it, the County bartered with the predecessor of Miller Septic for its vacuum truck services in exchange for permission to dump at the County's wastewater treatment plant.  Plaintiff also noted that the agreement had been in place for over fifteen years, and that "Miller ha[d] proven themselves to be very dependable."  She added that it was her "understanding . . . that because the system has served us well over the years, there did not appear to be any reason to change it."  The memo also included a "comparison of services provided," based on Miller Septic's minimum hauling rates and the County's standard sewer charges.  It totaled the services provided by Miller to the County at $33,090, and total estimated dumping charges by Miller at $32,220.

The parties discussed the situation at the Board meeting held the next day, June 13, 2013.

Gentile vented his frustration with the arrangement:

> You know, receiving the privilege of being allow [sic] to dump in our system at [half the rate charged elsewhere] . . . and then cutting everybody else off from that opportunity, I have a real problem. . . . And then I really have a problem when it goes down to say my understanding is because the system is served well over the years, and it doesn't appear to be any reason to change it.
>
> This should have been a glaring example of something is wrong and something needs to be addressed, because if this was my company and I did this agreement, I can do that. *But this is a public entity, we're a public entity and people need to be able to have the opportunity to compete for this business*, whether it be the business of extracting from our system, or the business of dumping in our system, and the fact that this is given to one person I have a real problem with it.

(Emphasis added.) Maple echoed the thought:

> Commissioner and Shannan I'm glad you guys investigated this because this isn't the way that this Board has ever operated. We do things by the book. *This is a verbal agreement and we don't do verbal agreements.* I'm glad we've unearthed it. *But let's fix it now, and how we fix it is either we – if we're going to have the service we bid it out and the best offer gets it, or we do away with it completely.*

(Emphasis added.) After learning from Michael Eroshevich, Operations Supervisor at the time, that the cost of a new vacuum truck was around $250,000, Maple indicated that "the next step to look at is we're going to have to contract out those services, and probably bid out those services on that kind of frequency a year. We're still going to have to pay somebody, but it should be open to public bid . . . . And I'm a fan of let's do it quickly, because once we've unearthed it we should fix it quickly." Both Gentile and Graham thanked Plaintiff for her report. Gentile reiterated:

> This is exactly the kind of deal in my own company I would do . . . a lot of business owners here. This is the kind of deal that we would do all of the time. Unfortunately we don't have the flexibility in the public sector. I understand why this was probably put in place years ago. It just doesn't pass the litmus test today.

Plaintiff followed up on the Board's request by contacting Stumphauzer and O'Toole, a law firm used by the County. But she did so without the Board's knowledge or authorization. In her June 17, 2013 e-mail to lawyer Tony Pecora, Plaintiff stated:

> In regards to our Sewer Department . . . we have a rather complicated situation. We had an 'agreement' in place with this local septic hauler; they make themselves available to us 24/7 and in return they are permitted to dump at our treatment plant. The agreement was in place for about 20 years, although nothing is written and there is no exchange of money. The commissioners were recently made aware of this agreement *and asked us to go out to bid for these services to make them fair and right.* The thing is our treatment plant does not have extra capacity so we cannot allow all the local haulers to dump there; there are a lot of them. But we need septic haulers several times a year, and when we do it's usually an 'emergency' situation. So it's hard to ask someone to come and do something for us, if they are not permitted to haul to our plant, you know what I mean? Anyways . . . how do we put this out to bid??? Do you have other clients with a similar situation?

(Emphasis added.) Plaintiff attached a copy of the memorandum she had sent to the Board.

On June 20, 2013, Plaintiff sent Pecora "a sample notice to bidders." In his response e-mail, Pecora asked, "What about sample specs?" The record is silent until July 26, 2013, when Plaintiff informed Pecora in an e-mail that she had received a public record request seeking the policy for septic hauling. She asked Pecora: "Is there any way that we can 'retrofit' an exchange of services agreement with the current company who we have worked with for 25 years? Just until we formally go out to bid or whatever the commissioners want to do?" Pecora told her that if no such contract existed, she did not have a duty to create one. He also instructed that she could "indicate that we are in the process of drafting a bid spec prospectively." In a follow-up e-mail he added: "If there are no policies, then indicate so." Plaintiff replied:

> Okay, but this guy knows that Miller dumps at our plant. For like 30 years there has been an 'exchange of services' agreement between Miller and the County. Other than Miller, we do not allow any septic haulers.

In the meantime, the old practice continued. At the August 16, 2013 meeting, the Commissioners were surprised to learn that the unbid hauling practice with Miller was still ongoing:

> COMMISSIONER THOMAS G. GENTILE - One of the things that we do want to discuss I would say on our June 13th Commissioner's Meeting we discussed that we had become aware that Miller Sanitation was being allowed to dump at our Sewage Treatment Plant and no other haulers were being allowed to dump that was the result of a verbal agreement that had been put in place some time ago.
>
> COMMISSIONER THOMAS E. GRAHAM - Not with us.
>
> COMMISSIONER GENTILE - Not with us, twenty (20) years ago with other Commissioners, not the Commissioners with the Water Department it was also – *I was under the impression, and the other Commissioners also, that policy was to end immediately. I think we stated pretty clear that we didn't believe in verbal agreements and we didn't do business that way.* I know that I stated that I believed it should stop. I believed it was incorrect. *I believed it provided, and I think I say here that this is a public entity, we're a public entity and people need to have the opportunity to compete for this business whether it is the business of the extraction of our systems or the business of dumping in our systems.* And the fact that it is given to one person I have a real problem with that. Those are my exact quotes from the discussion.
>
> *I left the meeting that day fully understanding this was going to stop.* And it came to my attention recently. I did confirm verbally with at least three (3) different people that the policy was still continuing. *And I wanted to make sure that it was very clear that this policy ceases immediately, and at the same time plan to conduct an investigation to find out exactly why it wasn't and what were the circumstances.*
>
> I don't know if you want to make a motion to make it even more clear that this policy is to stop immediately.

(Emphases added.) Maple made the motion, which all three Commissioners approved, making it clear that "no septic haulers be permitted to use the facility until we have an approved policy."

Perhaps sensing trouble, on August 19, 2013, Plaintiff e-mailed Pecora:

Regarding our phone call on Friday … is there any way you could send me an e-mail or something regarding our communication about the septic hauling, just to confirm we [sic] you and I had discussed?

Pecora replied:

Hi Shannan.  Just to reiterate what you and I discussed.  You asked me about bidding requirements regarding your present septic hauling arrangements.  Basically the county has been permitting a local hauler the exclusive opportunity to dump his own privately collected waste at the county wastewater treatment plant.  I was under the impression that the county really doesn't have the capacity to permit others to dump their waste beyond what is being dumped by this particular hauler.  In exchange for this exclusive right this hauler provides the county with "on the spot" waste removal services whenever we have clogged lines or pumps etc. he has been very reliable whenever there has been an immediate need.  The benefit the county receives from this relationship is around $30k or more.  The hauler benefits at around $30k as well.  Kind if [sic] a wash.
You further explained to me that other local haulers who became aware of this individuals [sic] right to dump became interested also in dumping at the county facility.  This posed a questions [sic] as to whether or not the right to dump at the county site needed to be bid out.  Initially since the value was under $50k I opined that the service probably didn't have to be bid.  However since you are giving exclusive rights to county property and because the combined arrangement likely exceeded $50k that it would be best to bid it out.

However in the interim the county needed services that if not performed could have endangered the health and safety of county residents.  Because of this because the hauler provided a specialized service and because of the lower threshold value I believed that the county could continue to temporarily use its previous hauler while it devised and implemented an appropriate bid.
That was my understanding of the matter.

On August 21, 2013, Plaintiff e-mailed the Commissioners, responding to the apparent rebuke she received at the August 16 meeting.  She explained that while "[t]he Board made it clear that current practices needed to be corrected," and that it was her "understanding that the District was to put these services out to bid as quickly as possible," she "d[id] not recall dialogue or being given any direction from the Board during that meeting on how the District should proceed with hauling until the bidding process was complete."  She detailed the efforts she had

made with Pecora. She indicated that she notified Miller Septic immediately after the August 16 meeting to cease dumping at the County facilities.

On September 5, 2013, the Board voted unanimously to suspend Plaintiff for thirty days, effective immediately, due to "insubordination on the job." Prior to the suspension, Plaintiff was called into executive session to discuss the disciplinary action. Michael Eroshevich, the Operations Supervisor, was made the Acting Director during Plaintiff's suspension.

After Plaintiff returned from her suspension, Eroshevich was no longer Acting Director.[3] Eroshevich testified that "from that day forward" nothing was done "for quite awhile," until December, when the Department "acquired some quotes from some different haulers."

On October 9, 2013, Pecora sent Plaintiff the following e-mail:

> As indicated to you on the phone, I have reservations about the County entering into a [sic] "exchange for services" agreement. I think that the County will have difficulty ascertaining the costs associated with transporting waste from one part of the County versus that in another area. The County may simply want to 'bid' out the work to be performed by the Contractor and pay for the services versus 'exchanging' the service for the right to dump wastewater. Perhaps the County [should] simply abstain from allowing anyone to dump wastewater period.
> Let me know if you want me to expand on this bid document. You will need to add the specs and other boilerplate.

The record is silent as to the bid document mentioned in this e-mail.

Eroshevich testified that in December 2013 the Department "got quotes . . . from three or four different haulers" and that Miller Septic was the lowest bid. He also stated that Miller Septic was no longer allowed to dump at the County plants and was paid each time it did anything for the County. Walt Kubat, Interim Operations Supervisor, got the quotes for Eroshevich. Kubat also testified that the Department still uses Miller Septic, but obtains quotes for that service. The record does not tell us what role Plaintiff played, if any, in this process.

---

[3] Eroshevich was made Assistant Director in November 2013.

On December 13, 2013, Gentile sent a letter to Pecora and his firm reminding them that their legal services had not been approved by the Board. He instructed Pecora to "please make sure that your firm does not provide any future services to Mrs. Gosbin and/or the . . . Department, unless and until approved to do so by the Commissioners," and to "refrain from sharing this correspondence with Mrs. Gosbin." According to Plaintiff, Commissioners Graham and Gentile also recommended terminating her around this time, although they did not share this with her.

On February 24, 2014, Plaintiff resigned from her position as Director and began working for Jefferson County Engineer James Branagan, where she is currently employed. On November 3, 2014, Eroshevich was promoted to Interim Director. Eroshevich was named Director on January 12, 2015. Although he has training and experience in wastewater treatment, Eroshevich does not have an engineering degree. Prior to making Eroshevich the Director, the Commissioners changed the job description in November 2014 to delete the engineering license requirement.

## B. Procedural History

Plaintiff sued under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e and Ohio Revised Code, § 4112.02(a). The district court granted summary judgment to Defendants, holding that Plaintiff failed to make out a prima facie case of gender discrimination because she failed to identify a similarly situated male who was treated more favorably despite its belief that the suspension was "undeserved":

> The Court pauses at this point to note that its review of the June 13, 2013, meeting minutes does not support the Commissioners' stated reason for suspending Plaintiff. Although the transcript of this meeting reflects the Commissioners' disapproval of the County's longstanding verbal agreement with Miller Septic and a directive to put out hauling services for public bidding, *it does not reflect an order by the Commissioners to cease and desist the agreement with Miller Septic*

> *pending completion of that bidding process.* It is clear to the Court, therefore, that Plaintiff's suspension for insubordination was undeserved.

(Emphasis added.) Notwithstanding, "[f]atal to Plaintiff's claim . . . [was] the lack of evidence that the undeserved suspension was imposed *because she was a woman.*"

The district court rejected Plaintiff's arguments that she was comparable to her male predecessors who were not suspended for using Miller Septic, or to her male successor, Eroshevich, who continued to use Miller Septic but was not suspended. The court held that "[n]one of these individuals [was] 'similarly situated'" to Plaintiff because "[t]he conduct at issue [was] Plaintiff's alleged insubordination." Thus, a comparator was "one who either failed to follow a direct order from the Commissioners or committed other conduct that could be construed as insubordination but was not suspended." The court held that Plaintiff was not constructively discharged because of her gender either. For the same reasons, the court found summary judgment proper on the state law claims.

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) requires that the court grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment should not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This court reviews the district court's grant of summary judgment de novo. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016).

**B. Suspension**

42 U.S.C. § 2000e–2(a)(1) prohibits an employer from taking an adverse employment action, such as a suspension, against an employee because of her sex. Here, Plaintiff relies on circumstantial evidence, so her claim is analyzed under the familiar *McDonnell Douglas/Burdine* framework. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005); *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008). To make out a prima facie case, a plaintiff must demonstrate that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably." *Grace v. USCAR & Bartech Tech. Servs, LLC*, 521 F.3d 655, 677 (6th Cir. 2008) (citation omitted).

The parties do not dispute that Plaintiff satisfied the first three elements of her prima facie case. Plaintiff argues that a genuine issue of fact exists as to the fourth element because she has identified at least two male comparators—Gilmore and Eroshevich. To demonstrate that an individual is a "similarly situated" comparator, a plaintiff is "required to prove that all of the *relevant* aspects of [her] employment situation were 'nearly identical' to those of [the male employee's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins*. Co., 40 F.3d 796, 802 (6th Cir. 1994)). For example, "similarly situated" in the disciplinary context means that, "the individuals with whom the plaintiff seeks to compare [her] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id*. (quoting *Mitchell v. Toledo Hosp*., 964 F.2d 577, 583 (6th Cir. 1992)). However, "the weight to be given to each factor can vary depending upon the particular case." *Johnson v. Kroger Co*., 319 F.3d 858, 867 (6th Cir. 2003) (citing *Ercegovich*, 154 F.3d at 352). In other words, context matters and exact correlation is not required. *Ercegovich*, 154 F.3d at 352.

### 1. Gilmore

As the district court held, Gilmore cannot be a comparable because the Commissioners were unaware of the verbal, unbid hauling agreement until after Gilmore had resigned and Plaintiff became Director. As Commissioner Maple stated at the June 13, 2013 meeting to Gentile and Plaintiff, "I'm glad you guys investigated this because this isn't the way that this Board has ever operated. . . . This is a verbal agreement and we don't do verbal agreements."[4] Thus, the Commissioners could not have directed Gilmore to do anything about it. *Cf. Russell v. Univ. of Toledo*, 537 F.3d 596, 607-08 (6th Cir. 2008) (black woman discharged from her position as a nurse for insubordination was not similarly situated to other medical center employees who had never refused to obey a direct order from a physician).

The comparison to Gilmore fails for other reasons. While employed at Jefferson County, he was not only the Director of the Department but also the Sanitary Engineer, a position he held because he had a professional engineer's license. *See* Ohio Rev. Code § 6117.01(A)(4)(a) (defining the "county sanitary engineer" as "[t]he registered professional engineer employed or appointed by the board of county commissioners"); *see also* Ohio Rev. Code § 4733.01(A) ("'Professional engineer' means a person registered as a professional engineer . . . ."). He also

---

[4] The parties use the terms "verbal agreement" and "exchange for services agreement" interchangeably to describe the unbid hauling arrangement with Miller Septic, although the gist was its status as an exchange for services agreement.

had twenty-five years of management experience. For these reasons, he was paid more. Plaintiff was never the Sanitary Engineer for the County, she did not possess a professional engineer's license at that time, and she had no prior management experience. Plaintiff has failed to demonstrate that Gilmore was similarly situated to her for purposes of the suspension.

### 2. Eroshevich

While Eroshevich's status is more akin to Plaintiff's, he too fails to match up as a comparator. Plaintiff claims that Eroshevich is a comparator because he also ignored the Commissioner's June 13 order asking Plaintiff to begin a public bidding process. Eroshevich testified that he understood that the Commissioners wanted the Department to stop the hauling practice, but the record reflects that the Commissioners instructed Plaintiff, not Eroshevich, to discontinue the hauling process and that Plaintiff understood the directive was to her. First, Gentile asked Plaintiff to look into the matter, not Eroshevich. At the June 13 meeting, Plaintiff, not Eroshevich, responded to Gentile's frustration with the Miller hauling arrangement, stating that she completely understood. Eroshevich's involvement at the June 13 meeting was limited to answering Maple's inquiries regarding the cost and uses of a vacuum truck. This was consistent with his typical role at the meetings; he attended only if Plaintiff asked him to be there, as she was then the Director and Eroshevich's supervisor. Nor does Plaintiff offer proof that the Commissioners ordered Eroshevich to start the bidding process during his one-month stint as Acting Director during Plaintiff's suspension. In short, as the district court observed, "[t]here simply is no evidence that Eroshevich was given a directive regarding Miller Septic that he did not follow."

Furthermore, Eroshevich *actually did something* about the unbid hauling arrangement (while Plaintiff was still Director). Granted, as Plaintiff points out, Eroshevich did not obtain

public bids as directed by the Commissioners but merely obtained quotes for one project. Miller Septic submitted the lowest bid and is now paid for its services. Thus, Eroshevich addressed—and remedied—the Commissioners' real concern with the Miller Septic hauling arrangement: that it was an informal, noncompetitive, exchange for services agreement, unsuitable for a public entity (and possibly in violation of state law, *see* Ohio Rev. Code § 307.86).[5]

Plaintiff's other arguments are unavailing and warrant little attention. Although she may have been criticized for using outside engineers and Eroshevich was not, she has not pointed to any evidence that she was subjected to any adverse action for her use of outside engineers. In fact, she received a raise despite a poor evaluation on June 5, 2013. And, although Eroshevich ultimately replaced Plaintiff, and the job description was rewritten to omit the engineering license requirement, this was done months after Plaintiff had resigned and therefore cannot establish that Eroshevich was a comparator.

### 3. False Premise

Plaintiff argues that she was never ordered to cease and desist with the hauling practice, and therefore requiring her to identify comparators who were not disciplined for failing to follow a direct order "is a false premise." Plaintiff is partially correct. As the district court observed, the Commissioners did not decree on June 13, 2013 that the unbid hauling arrangement cease and desist immediately. Thus, she was not "insubordinate" as to that directive. But, as the district court also observed, the Commissioners conveyed "a directive to put out hauling services for public bidding." And Plaintiff's comments at that meeting reflect that she got that message: "I completely understand that. I think if it is requested that we no longer continue any of the

---

[5] Pecora's e-mail dated August 19, 2013 reflects his concern that because the combined arrangement of dumping and hauling exceeded $50,000, the service needed to be bid out.

service with Miller the County would just prefer not to have haulers at all." Gentile immediately "requested," stating that the situation "needs [to be] looked at, needs [to be] addressed and probably needs [to be] corrected." Maple agreed: "But let's fix it now, and how we fix it is either we – if we're going to have the service we bid it out and the best offer gets it, or we do away with it completely." After asking Eroshevich about the cost-benefit of purchasing a vacuum truck, Maple said: "So the next step to look at is we're going to have to contract out those services, and probably bid out those services on that kind of frequency a year. . . . There is work to do to clean this up and fix it going forward. And I'm a fan of let's do it quickly . . . ." In her deposition testimony, Plaintiff stated that she understood Maple's statement to mean that "[a] bidding process is what [the Commissioners] wanted" and that "anybody as a director would have taken that to mean that it needs bid out immediately." She was the Director at the time. Moreover, the request was rooted in Ohio law, which requires counties to obtain contracts through competitive bidding in certain situations. *See* Ohio Rev. Code § 307.86 (requiring that services "by or on behalf of the county . . . at a cost in excess of fifty thousand dollars . . . shall be obtained through competitive bidding").

Plaintiff clearly sensed that she was expected to do something because the Monday following the June 13 meeting she contacted Pecora and told him that "[t]he commissioners were recently made aware of this agreement *and asked us to go out to bid for these services to make them fair and right*." (emphasis added). She also asked him, "how do we put this out to bid???", and sent "a sample notice to bidders," on June 20, 2013. But not much happened in the next two months. In fact, on July 26, 2013, Plaintiff asked Pecora if there was a way to "retrofit" a contract on the Miller hauling arrangement. Not surprisingly, the Commissioners were more than nonplussed two months later at the August 16 meeting because the unbid hauling

arrangement was still in place and nothing had actually been done to change it. In fact, although she made a call or two to Pecora and sent a few e-mails, Plaintiff basically dragged her heels, apparently because she thought the arrangement with Miller Septic was satisfactory. Although she told the Commissioners in her August 21, 2013 e-mail that she was actively pursuing a public bidding process with Pecora, the record before us does not support that assertion, especially since she did not have the Commissioners' authority to hire Pecora. Thus, from the Commissioners' standpoint, as of August 16, 2013, nothing had been done about the unbid hauling process. Although "insubordination" may not have been the best word choice because the Commissioners did not issue a military-style order on June 13, 2013, the Commissioners' indignation on August 16, 2013 is sustained by Plaintiff's inaction regarding their directive to begin a public bidding process.

In the end, whether deserved or not, there is no proof that the suspension was based on Plaintiff's gender. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012) (undeserved suspensions are not actionable under Title VII). Plaintiff must show that the adverse action was not simply unfair, but a pretext for discrimination. Absent any comparators, the only other evidence is Gentile's comment in early 2010 denying that he wanted Plaintiff out of management and his subsequent explanation that "it's not because you're a woman." But an isolated stray comment, three and one-half years before she was suspended, does not create an inference of discrimination. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 997 (6th Cir. 2009) (holding that a single, isolated comment did not "rise to the level of a materially adverse employment action"); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025-26 (6th Cir. 1993) (holding that isolated, ambiguous comments made nearly a year before the alleged discriminatory action did not establish the necessary inference of discrimination).

Even if Plaintiff had made out a prima facie case,[6] she has not shown that the Board's reason for suspending her had no basis in fact, was not the actual reason, or was insufficient to explain the Board's action. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Although the Commissioners did not issue a direct "cease and desist" order, they clearly asked Plaintiff to begin a public bidding process to replace the unbid hauling arrangement *tout de suite*; thus they had an "an honest belief" that Plaintiff did not follow their orders. *See Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (holding that even if the employer's reason turns out be incorrect, it cannot establish pretext if the employer had an honest belief that it was legitimate).

### C. Constructive Discharge

Plaintiff also alleges that she was constructively discharged in violation of Title VII. A constructive discharge satisfies the adverse employment action element of Plaintiff's prima facie case. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). A constructive discharge claim has two basic components: discrimination by an employer so severe that a reasonable person would have been compelled to resign and an actual resignation. *Green v. Brennan*, 136 S. Ct. 1769, 1776-77 (2016) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 141-43 (2004)). To establish a constructive discharge, the plaintiff must prove both that "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the employer did so with the intention of forcing the employee to quit." *Logan,* 259 F.3d at 568-69 (quoting *Moore v. KUKA Welding Sys.& Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). Courts look at all the circumstances, including "the frequency of the discriminatory

---

[6] The district court did not perform the *McDonnell Douglas/Burdine* burden-shifting analysis because Plaintiff failed to make out a prima facie case. *See Burdine*, 450 U.S. 248; *McDonnell Douglas Corp*, 411 U.S. 792; *White*, 429 F.3d at 240.

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 635 (6th Cir. 2003) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).

Plaintiff lists thirteen items in support of this claim. She fails to provide record citations for many and it is not our duty to search the record. *See* Fed. R. App. P. 28(a)(8)(A) ("The appellant's brief must contain . . . [the] appellant's contentions and the reasons for them, with citations to the authorities *and parts of the record on which the appellant relies*[.]") (emphasis added). *See Wardle v. Lexington–Fayette Urban Cty. Gov't*, 45 F. App'x 505, 509 (6th Cir. 2002) (per curiam) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out."). We therefore address only those allegations for which there is cited record support.

### 1. What She Heard

Plaintiff contends that statements made by Frank Sidari, Brad Cane, Selznick, David Hayes, and Francis McIntyre all create an inference that Gentile was out to get her.[7] Problem is, such statements are inadmissible hearsay because Plaintiff's only support is her own deposition testimony. Thus, they cannot be considered for purposes of summary judgment. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Plaintiff does not argue that the hearsay statements of Cane, Selznick, Hayes, or McIntyre qualify under any hearsay exception, so we disregard those statements. *Id.*

Plaintiff argues Sidari's statement to her regarding what Commissioner Gentile said is admissible as a party opponent admission under Fed. R. Evid. 801(d)(2). But "each level of

---

[7] Plaintiff acknowledged that she could not recall whether Cane, or Selznick said that Plaintiff was "receiving a hard time" at Commissioners' meetings because she is female.

hearsay must fall within an exception to Rule 801 to be admissible." *Moore*, 171 F.3d at 1081 (citing Fed. R. Evid. 805)). Sidari is a nonparty and there is no proof that he was an agent of the Commissioners or otherwise authorized to make statements on their behalf regarding employment matters. *See* Fed. R. Evid. 801(d)(2)(C)-(D). In fact, Gentile disputes that he made any statement to this effect, let alone authorizing Sidari to make it for him. The statement also does not fall within the other third-party opponent exceptions.

Gentile's alleged comment to Plaintiff that "Well, it's not because you're a woman" is a party-opponent admission. If read literally, it directly contradicts the assertion that Gentile wanted her out of management because of her gender. If perceived that Gentile "doth protest too much," it still fails to provide sufficient evidence to support a constructive discharge claim. *Cf. Hunter*, 565 F.3d at 995, 997 (holding that employer's statement that "any high school kid" could perform the employee's job did not give rise to an inference of discriminatory action).

Plaintiff also states that Maple told her that Gentile did not want her to succeed and that he, Maple, could not help her. But she does not offer evidence that Gentile's hostility was based on her gender.

### 2. Law Firm Letter

Plaintiff claims that Gentile's December 2013 letter to Pecora and his firm, reminding them that they had not been approved to provide services to the County especially if requested by Plaintiff, also created an intolerable working condition. Plaintiff cannot legitimately claim to be affected by this letter, because (1) she never asked the Commissioners for permission to seek legal advice in preparing a public bidding process and was therefore blocked from seeking legal assistance; (2) she was not authorized to directly contact outside legal counsel, *see* Ohio Rev.

Code § 309.09(C) (outlining the statutory procedure for a board of county commissioners to obtain legal counsel); and (3) she was unaware of the letter.

### 3. Micromanagement

Plaintiff relies on statements by Walt Kubat that Plaintiff was asked "ridiculous" questions at meetings; "like we were micromanaged." Conclusory allegations do not support a constructive discharge claim. *See McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990). Moreover, the only example Kubat provided was a question *to him* about the color of a snow plow. In any event, Kubat stated that although he believed that Plaintiff was suspended based on her gender "because no other director had ever been suspended for anything," he admitted that he had no evidence of that.

### 4. Inability to Hire and Fire

Plaintiff claims, again without record citation in support, that she was "relieved of the ability to hire or fire." However, in her deposition testimony, Plaintiff testified that she was permitted to hire the Department's Operations Supervisor and waterline maintenance workers (although "the commissioners were very involved . . . [t]hey reviewed the applicants, sat in on the interviews").

### 5. Public Chiding

Plaintiff contends that she was chided by the Commissioners at public meetings, especially on September 5, 2013 when she was suspended. Plaintiff was suspended on the record after the Commissioners came out of an executive session for the stated purpose of discussing personnel matters, and Graham moved to suspend Plaintiff for thirty days for "insubordination on the job." However, this unfavorable action is not the stuff of constructive

discharge.  *See Wasek*, 682 F.3d at 467 ("[T]he conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender.").

In short, whether viewed singly or collectively, the foregoing incidents did not create "objectively intolerable" working conditions, *see Savage v. Gee*, 665 F.3d 732, 740 (6th Cir. 2012), that would compel a reasonable person in Plaintiff's shoes to resign.  *See Logan*, 259 F.3d at 569.

### III. CONCLUSION

The district court's judgment is **AFFIRMED**.